Edward L. **SHRINER**, Appellant–Plaintiff,

v.

Thomas P. **SHEEHAN** and Universal Distributors Company of Indianapolis, Inc., Appellees–Defendants.

No. 49A02–0108–CV–545.

Court of Appeals of Indiana.

Aug. 6, 2002.

Robert P. Johnstone, Bart A. Karwath, Barnes & Thornburg, South Bend, IN, Attorneys for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

Edward L. Shriner appeals a number of issues arising out of the trial court's judgment in a suit he filed against Thomas P. Sheehan and Universal Distributors Company of Indianapolis, Inc. (collectively, Defendants) involving his termination from the company and the subsequent corporate buy-out of his minority shareholder interest. Shriner claims that the trial court applied the wrong valuation formula in determining the buy-out value of his shares of stock and that he is entitled to 10% of the company's distributions made after the date of his termination. Shriner also asserts that the trial court erred in determining that his claims of excessive compensation and misuse of company employees was barred by a two-year statute of limitations, the doctrine of laches, and unclean hands. Further, Shriner argues that the trial court erred in denying his constructive fraud claim involving the sale of another business in which he was a part owner. Finally, Shriner argues that he should not be ordered to surrender a life insurance policy that he owns. Because we find that the trial court applied the wrong valuation formula and that Shriner's claim of excessive compensation is not totally barred, we reverse in part and remand to the trial court with instructions.[1]

### Facts and Procedural History

Shriner is a former employee and minority shareholder in two companies, Universal Distributors and Carmel Financial Cor-

James R. Fisher, Debra H. Miller, Fred R. Biesecker, Ice Miller Donadio & Ryan, Indianapolis, IN, Attorneys for Appellant.

1. Oral argument was held in this case on June 25, 2002.

poration (collectively, Business). Sheehan incorporated Universal Distributors in 1967 as a door-to-door encyclopedia sales company, and Carmel Financial was created in 1988 to finance contracts generated from the encyclopedia sales. The two companies formally merged in 1999 even though they operated together as essentially one business in the years leading to the merger.

On January 4, 1985, Shriner entered into a three-year employment contract (Employment Agreement) with Universal Distributors. Under the Employment Agreement, Shriner was named Vice President and Chief Operating Officer of Universal Distributors. In addition to his salary, the Employment Agreement provided Shriner with an incentive bonus equal to 2% of yearly profits. Under the Employment Agreement, Sheehan and Shriner also agreed that if Sheehan ever increased his own salary above $200,000, the amount of the increase would be added back to the profits for the purpose of calculating Shriner's 2% incentive bonus. After the Employment Agreement expired on December 31, 1997, Shriner retained his position in the Business and continued to collect his 2% incentive bonus from the profits of both Universal Distributors and Carmel Financial. While Shriner was employed with the Business, his salary increased from $71,402 to $265,972, and Sheehan's salary increased from $175,000 to $1,047,448.

On December 1, 1986, Shriner entered into a stock agreement (1986 Stock Agreement) with Sheehan and Universal Distributors. The 1986 Stock Agreement provided that "Shriner shall be credited with 1% of the stock of the company issued from time to time for each year of service he renders the company from and after January 4, 1985" until the time that he received 10% of the stock ownership of Universal Distributors. Exhibit 2. The 1986 Stock Agreement also provided for circumstances in which Shriner or Sheehan could purchase the other's interest in Universal Distributors. For purposes of determining the value of each share of stock, the 1986 Stock Agreement provided:

> The net worth of the company shall be deemed to be an amount equal to the company's assets less the amount of its liabilities on the valuation date as disclosed by the company's books of account regularly maintained in accordance with generally accepted accounting principles consistently applied. No amounts shall be included for good will or going concern value of the company which are not shown on the books of the company.

Exhibit 2. The 1986 Stock Agreement also applied to Carmel Financial when that company was eventually created. By January 4, 1995, Shriner owned a 10% interest in the Business.

On October 5, 1988, Sheehan and Shriner entered into a Buy–Sell Agreement (1988 Buy–Sell Agreement), which changed some of the procedures for the transfer of the Business's stock in the event of Sheehan's death. Under the 1988 Buy–Sell Agreement, the value of the Business was changed to "equal two (2) times the book value of the Corporation as determined by the audited financial statements of the Corporation for the calendar quarter ending immediately preceding the date of Sheehan's death." Exhibit 3.

The formula for determining the purchase price of the Business was changed once again on December 21, 1993, when Sheehan and Shriner entered into two Cross–Purchase and Redemption Agreements for the stock of Universal Distributors and Carmel Financial (collectively, 1993 Cross–Purchase and Redemption

Agreements). The 1993 Cross–Purchase and Redemption Agreements provided:

A. The share price shall be determined by dividing the net worth of the Corporation (as determined by the accountant for the Corporation by subtracting the total indebtedness of the Corporation from the total assets of the Corporation) by the number of outstanding issued shares of the Corporation.

B. The net worth shall be computed as of the last day of the month immediately preceding the month in which the notice of intention to sell is tendered. Exhibits 4, 5. The 1993 Cross–Purchase and Redemption Agreements also provided that in the event of voluntary or involuntary termination of employment with the Business, the shareholder must sell his stock back to the Business or the remaining shareholder. An addendum to the 1993 Cross–Purchase and Redemption Agreements voided all previous stock transfer agreements between Shriner and Sheehan.

In connection with the 1988 Buy–Sell Agreement, the Business bought a five-million-dollar whole life insurance policy on Sheehan's life and put it in Shriner's name. The Business later purchased an additional term life insurance policy of $6,400,000. The Business paid the premiums on the policies, but Shriner paid taxes on the financial benefit he received as a result of the insurance being purchased for him. The purpose of the insurance policies was to insure that upon Sheehan's death, Shriner would have sufficient funds to cover all or at least a significant portion of the purchase price of Sheehan's 90% interest in the Business.

In addition to their ownership of the Business, Sheehan and Shriner each owned one-third of Rapid Collections, a company that did collections work for the Business. Shriner and Sheehan made initial capital contributions of $2,000 to Rapid Collection; however, during the course of their ownership, Shriner took back $1,000 of the contribution. Sheehan and Shriner owned Rapid Collections with the man who ran the company, Joe Simala. In 1993, Sheehan became concerned that Simala's behavior toward Rapid Collections' employees could lead to a lawsuit and that there was a liability risk for Shriner and Sheehan in the event that the corporate veil might be pierced because of the overlap in ownership between Rapid Collections and the Business. Sheehan told Shriner that he thought the two should no longer be shareholders in Rapid Collections. Shriner and Sheehan sold their stock interest in Rapid Collections for their remaining capital contribution. Even after Simala became the sole shareholder of the company, however, Rapid Collections continued to pay two-thirds of its profits to the Business.

Throughout Shriner's employment with the Business, Sheehan's wife was on the Business's payroll even though she quit working for the Business in 1985. At times, Sheehan's daughter and Shriner's father also were on the Business's payroll without actually doing any work. In addition, employees of the Business, including Shriner, periodically provided accounting, payroll, and inventory services for the Shadeland Dome, a hotel owned by Sheehan. Shadeland Dome did not compensate the Business for the work performed by these employees.

On August 27, 1996, Sheehan terminated Shriner's employment with the Business. Following the termination, Sheehan instructed the Business's Chief Financial Officer, Paul Hayden, to calculate 10% of the shareholders' equity listed on the Business's balance sheet as of July 31, 1996. Based on this calculation, Sheehan tendered Shriner payment for his 10% inter-

est in the Business in the amount of $901,717.90. Shriner refused this payment. After Shriner's termination, the term life insurance policy was canceled because the Business quit paying the premiums; however, Shriner took loans out on the whole life insurance policy in order to pay its premiums.

On December 13, 1996, Shriner brought suit against Sheehan and the Business. In his Second Amended Complaint filed on June 15, 1998, Shriner alleged that (1) Sheehan violated his duty of "Good Faith and Fair Dealing" by terminating Shriner's employment; (2) Sheehan's actions in procuring the transfer of Shriner's one-third interest in Rapid Collections constituted a constructive fraud; (3) Sheehan took significant distributions from the Business in the form of his excessive salary, his family member's salary, and the uncompensated work performed by Business employees on the Shadeland Dome, without making proportionate distributions to Shriner; (4) the life insurance policies were Shriner's unrestricted property and Sheehan was obligated to maintain coverage after Shriner was terminated from the Business; and (5) the 1993 Cross–Purchase and Redemption Agreements should be interpreted to provide for a fair market valuation of the Business instead of the book value valuation that was used to calculate the price of Shriner's shares of stock in the Business.

Along with its Answer, the Defendants filed a counterclaim alleging that Shriner breached the 1993 Cross–Purchase and Redemption Agreements when he refused to transfer his stock after the purchase price was tendered to him; (2) Shriner no longer had an insurable interest in Sheehan's life and that the insurance should be canceled or assigned to the Business; and (3) Shriner had improperly depleted the cash value of the insurance policy without reimbursing the Business.

A bench trial was held on this case on October 24–26 and November 14–15, 2000. On July 19, 2001, the trial court issued its Findings of Fact, Conclusions of Law, and Entry of Judgment. The trial court concluded " 'book value' of the assets is the proper asset value to be used in a total asset calculation in the absence of language expressly requiring a market or some other value calculation" and ordered Shriner to accept the previously tendered payment and transfer his stock to Sheehan. Appellant's App. p. 44. The trial court ruled that Shriner was an employee-at-will whose employment could be terminated at any time and that a two-year statute of limitations and the equitable doctrine of laches barred Shriner's claims involving Sheehan's compensation and use of corporate assets and personnel. The court also ruled that Shriner's claim involving the use of the Business's employees was barred by the equitable doctrine of unclean hands.

With regard to Shriner's claim for constructive fraud, the trial court rejected the claim finding that there was no misrepresentation and that it was also barred by laches. On the issue of the life insurance policies, the trial court exercised its equity power and ordered Shriner to surrender the whole life policy to the insurance company and receive the cash surrender value or to sell it to the Business for the cash surrender value. This appeal ensued.

## Discussion and Decision

Shriner raises a number of arguments on appeal, which we construe as follows. First, Shriner argues that the trial court erred when it concluded that the 1993 Cross–Purchase and Redemption Agreements requires the Business's share price to be determined by using book value. Second, Shriner claims that he is entitled

to 10% of the Business's distributions made after the date of his termination with the Business. Third, Shriner asserts that the trial court erred in determining that his claim of excessive compensation was barred by a two-year statute of limitations and the equitable doctrine of laches. Fourth, Shriner asserts that it was also error for his claim of misuse of Business personnel to be barred by a two-year statute of limitations and the equitable doctrines of laches and unclean hands. Fifth, he argues that the trial court erred in denying his constructive fraud claim involving the sale of Rapid Collections. Finally, Shriner argues that he should not be ordered to surrender the life insurance policy because it is his unrestricted property.

■■■ In rendering its judgment, the trial court, upon the Defendants' timely filed motion, made special findings of fact and conclusions of law. When a trial court has made special findings pursuant to a party's request under Indiana Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings. *G & N Aircraft, Inc. v. Boehm,* 743 N.E.2d 227, 234 (Ind.2001). "[T]he court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* (quoting Ind. Trial Rule 52(A)). However, while we defer substantially to findings of fact, we do not do so to conclusions of law. *Menard, Inc. v. Dage–MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind.2000). We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions. *Carmichael v. Siegel,* 754 N.E.2d 619, 625 (Ind.Ct.App.2001). We will find a judgment to be clearly erroneous if it relies on an incorrect legal standard. *Menard,* 726 N.E.2d at 1210.

## I. The 1993 Cross–Purchase and Redemption Agreements

Shriner asserts that the trial court erred in interpreting the 1993 Cross–Purchase and Redemption Agreements to require the net worth of the Business to be computed for purposes of determining share price by looking solely at the Business's balance sheets on the last day of the month immediately prior to the termination. Instead, Shriner contends that the contract should be interpreted so that the share price is calculated by applying a formula that uses fair market value, which factors in an amount for good will, rather than relying on book value.

■■■ Construction of the terms of a written contract is a pure question of law for the court, and we conduct a de novo review of the trial court's conclusions in that regard. *Grandview Lot Owners Ass'n, Inc. v. Harmon,* 754 N.E.2d 554, 557 (Ind.Ct.App.2001). If a contract is ambiguous because of the language used in the contract, rather than because of extrinsic facts, its construction is a pure question of law to be determined by the court. *Id.* A contract is not ambiguous merely because a controversy exists where each party favors a different interpretation; rather a contract is ambiguous where it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning. *Ind. Dep't of Transp. v. Shelly & Sands, Inc.,* 756 N.E.2d 1063, 1069–70 (Ind.Ct.App.2001), *trans. denied.* Absent ambiguity, this court will give the terms of a contract their plain and ordinary meaning. *Id.* at 1070; *see also Battershell v. Prestwick Sales, Inc.,* 585 N.E.2d 1, 5 (Ind.Ct.App.1992), *trans. denied.*

Turning to the contract, the 1993 Cross–Purchase and Redemption Agreements provide in pertinent part:

3. PURCHASE PRICE OF SHARES. Each share of stock sold under this agreement shall be sold at the price and in the manner described below:

A. The share price shall be determined by dividing the net worth of the Corporation (as determined by the accountant for the Corporation by subtracting the total indebtedness of the Corporation from the total assets of the Corporation) by the number of outstanding issued shares of the Corporation.

B. The net worth shall be computed as of the last day of the month immediately preceding the month in which the notice of intention to sell is tendered.

Exhibits 4, 5. Based on this language, the trial court concluded that "[t]he reasonable interpretation of the [1993 Cross–Purchase and Redemption Agreements] is that upon Shriner's termination the net worth of the business was to be computed by looking at the business'[s] balance sheet on the last day of the month immediately prior to the termination." Appellant's App. p. 43.

In arriving at this conclusion, the trial court reasoned:

The agreement unambiguously requires: (1) that the net worth calculation be done by an accountant; (2) that the accountant subtract the total indebtedness from the total assets to determine net worth; and (3) that the accountant "compute" net worth as of a certain date in the immediate past—*i.e.,* the last day of the month immediately preceding the month in which the event triggering a stock purchase (here, the termination of Shriner) took place. Ex. 4–5. Because the [1993 Cross–Purchase and Redemption Agreements] specifically identifies an accountant as the person who is to perform the net worth computation, it is reasonable to conclude that the accountant would base the net worth calculation on the total assets and total indebt-

edness figures shown on the companies' balance sheet, which is prepared by an accountant using accounting rules and principles.

. . . .

The lack of any reference to the term "fair market" in the [1993 Cross–Purchase and Redemption Agreements] should be interpreted to mean that the corporate assets are to be assigned the value listed on the corporate books. Typically, corporate assets are valued by looking to the value "as stated on the books, not at their market value." 18A Am.Jur.2d § 707 (1985). Therefore, the so-called "book value" of the assets is the proper asset value to be used in a total asset calculation in the absence of language expressly requiring a market or some other value calculation.

Appellant's App. p. 44. While close corporations do often use book value to set the price of shares of stock, we disagree with the trial court that the 1993 Cross–Purchase and Redemption Agreements require the Business's share price to be determined by using book value.

 Close corporations generally find no market for their shares and the only people interested in the business are the "incorporated partners" who are intimately involved with the entity. *Krukemeier v. Krukemeier Mach. & Tool Co.,* 551 N.E.2d 885, 890 (Ind.Ct.App.1990). Because there is often no market, it is difficult and speculative to value a close corporation's shares; therefore, repurchase agreements often call for sale at book value, determined per share by dividing the corporation's net worth as shown on the corporate books by the number of shares outstanding. *Id.* (citation omitted). "This method's disarming appearance of simplicity probably accounts for the frequency of its use, but the measure is only as good as the extent to which the book value corre-

sponds with the true value of the corporation." 1 O'Neal & Thompson, O'NEAL'S CLOSE CORPORATIONS § 7.27, at 116 (3d ed.1998). The book value method has been criticized because it does not take into account the worth of a going business. *Krukemeier,* 551 N.E.2d at 890. In particular, reflecting the conservative nature of accounting, "[t]he value of intangible assets, particularly goodwill, is almost never accurately shown on corporate books.... Yet goodwill can be an important part of the value of the company that a departing shareholder would want to share...." O'Neal, *supra,* § 7.27, at 117. Nevertheless, it is for the parties, not the court, to stipulate to a valuation method in a purchase agreement, and we will not rewrite an explicit agreement even if that method does not produce a price for the shares of stock that reflects the business's true value. *See Krukemeier,* 551 N.E.2d at 890; *see also Battershell,* 585 N.E.2d at 5.

■■■■ When the parties are silent as to the method used for determining the price of stock, however, we find that fair market value is the appropriate method of valuing stock. *Battershell,* 585 N.E.2d at 5. In addition, if an agreement is ambiguous in its method of valuing stock, this court will presume that a fair market valuation is the proper approach. *See id.* at 5–6. "Instead of requiring parties to explicitly state that stock is to be valued solely on its fair market value, we find the better rule is to require parties who wish to deviate from fair market value to express clearly that intent." *Id.* at 6.

■■■ In this case, we do not read the 1993 Cross–Purchase and Redemption Agreements to call for the use of the book value method. The 1993 Cross–Purchase and Redemption Agreements provide that the net worth of the company is found by "subtracting the total indebtedness of the Corporation from the total assets of the

Corporation." Exhibits 4, 5. The formula set out in the 1993 Cross–Purchase and Redemption Agreements does not limit the assets used in the calculation to those found on the Business's balance sheets, nor does it exclude intangible assets from the calculation. The agreement unambiguously calls for a calculation that includes the "total assets of the Corporation." We do not agree with the trial court that the assets used in the calculation were reduced from "total assets" to only those found on the Business's balance sheets by language in the 1993 Cross–Purchase and Redemption Agreements that established the timing of the calculation and the identity of who would make that calculation. Moreover, without language expressly requiring the book value method or any other type of valuation method, there is a presumption that fair market valuation is the proper approach for valuing stock. Therefore, we find that the trial court erred in applying the book value method and conclude that the value of the Business's shares of stock should have been based on the Business's fair market value.

In addition, we find that the error in applying the book value formula instead of the fair market formula may have had a substantial impact on the Business's valuation. In its judgment, the trial court found:

> By purchasing Shriner's stock under the net worth price standard in the parties' December 1993 Agreement, Sheehan was not reaping an economic benefit for himself. The only evidence of anything approximating an offer to purchase the company being made around the time of Shriner's termination indicates that the price a potential purchaser might have been willing to pay to purchase the company was book value. *See* Trans. Vol. IV, p. 875 line 6 to p. 880 line 11; Ex. 40 (Urso letter containing a non-binding of-

fer to purchase the company at book value). The only competent evidence in the trial record regarding what a fair market value of the company might have been around the time of Shriner's termination is that the fair market value was no more that *book value*. Trans. Vol. IV, p. 880 line 2–3.

Appellant's App. p. 29. However, the evidence presented does not support this finding. Instead of proposing a purchase price equal to only the Business's book value, the Urso non-binding letter of intent that was sent to Sheehan on October 14, 1996 provided:

> Cash at closing equal to your net book value (approximately $10,000,000) plus pay off existing notes payable (which including notes to you, equal approximately $15.0–$16.0 million) and assume and continue other ordinary balance sheet liabilities, shown as accounts payable, accrued expenses, agent and dealer reserves, obligation under capital lease and mortgage payable.

Exhibit 40. Moreover, a letter of interest sent on April 12, 1996, from another company contemplating buying the Business proposed a purchase price "between $15,000,000 to $20,000,000." Appellant's App. p. 556. In addition, Shriner's witness, Scott Read, a certified public accountant with the accounting firm of Katz, Sapper & Murray placed the fair market value of the Business at $15,139,273, using a business valuation formula that included normalized earnings from 1995. Exhibit 78, Tr. p. 423–429.

While we are not in a position to determine what is the actual fair market value of the Business, we conclude that the trial court erred in finding that the only competent evidence in the trial record provided that fair market value would be no greater than book value. We remand with instructions for the trial court to determine the value of the Business's shares of stock based on the Business's fair market value as of July 31, 1996.

## II. Post-termination Shareholder Distribution

In his initial brief, Shriner claimed that he should receive his portion of distributions made by the Business after he was terminated. However, in his reply brief, Shriner concedes that if he receives the proper payment price for his shares of stock with interest, he cannot also receive post-termination distributions. Appellant's Reply Br. 12. We agree.

■ As of the date of valuation of the Business, July 31, 1996, Shriner no longer can be viewed as an equity participant in the Business and is not entitled to further dividends. *See G & N Aircraft*, 743 N.E.2d at 245. An award of both the full value of the shares and post-termination distributions would produce a double recovery for Shriner. *See id.* Therefore, we find that the trial court was correct in not awarding Shriner any portion of the distributions made after his termination.

## III. Excessive Compensation

Shriner's next allegation is that the trial court erred in concluding that his claim for excessive compensation was barred by a two-year statute of limitations and the equitable doctrine of laches. At trial, Shriner asserted that Sheehan's salary was excessive to the extent that the salary, which reached $1,047,488, exceeded the market value for the services actually rendered and that the excessive salary constituted disguised ownership distributions, which necessitated the making of proportionate distributions to Shriner.

■ A court of equity will provide a minority shareholder with a remedy when a majority shareholder of a close corporation, in violation of a fiduciary obli-

gation, appropriates the profits of the corporation for salaries. *Lowry v. Lowry,* 590 N.E.2d 612, 621 (Ind.Ct.App.1992), *reh'g denied, trans. denied.* However, a court may not substitute its judgment for that of the board of directors in determining what is a fair and reasonable compensation for corporate officers. *Id.* "Once a corporate officer's compensation is challenged, the burden of establishing unreasonable compensation lies with the minority shareholder instituting the action." *Krukemeier,* 551 N.E.2d at 887 (quoting *Cole Real Estate Corp. v. Peoples Bank & Trust Co.,* 160 Ind.App. 88, 310 N.E.2d 275, 280 (1974)). "The standard of proof in compensation cases requires a plaintiff shareholder to show the compensation is unjust, oppressive, or fraudulent." *G & N Aircraft,* 743 N.E.2d at 239 (quoting *Krukemeier,* 551 N.E.2d at 888).

In its judgment, the trial court did not reach the merits of Shriner's claim, but instead ruled that the claim for excessive compensation was barred by a two-year statute of limitations and the equitable doctrine of laches. Without any finding by the trial court on the issue, we are unable to determine whether Sheehan's salary was actually excessive; however, we are able to decide what is the applicable statute of limitations in this case and whether the claim is barred by the equitable doctrine of laches.

### A. Statute of Limitations

Turning first to a discussion on the applicable statute of limitations, Shriner asserts that there is a split in authority between the panels of this court as to what the applicable statute of limitations is for a claim of breach of corporate fiduciary duty in general and one for excessive compensation in particular. Appellant's Br. p. 32.

In support of this contention, Shriner directs us to *Bacompt Systems, Inc. v. Ashworth,* 752 N.E.2d 140, 145 (Ind.Ct.App. 2001), *trans. denied,* in which one panel of this court characterized a cause of action for breach of fiduciary duty as a tort claim for injury to personal property with a two-year statute of limitations [2] and *Lowry v. Lowry,* 590 N.E.2d 612, 618–19 (Ind.Ct. App.1992) (citing *Dotlich v. Dotlich,* 475 N.E.2d 331, 340–42 (Ind.Ct.App.1985), *trans. denied, but abrogated on other grounds by State Board of Tax Commissioners v. Town of St. John,* 751 N.E.2d 657 (Ind.2001)), in which one panel noted that actions for breach of fiduciary duty including claims of excessive compensation could fall under the six-year statute of limitations for fraud,[3] or the ten-year statute of limitations for actions which are not governed by any other statute.[4] In addition, another panel of this court determined that the breach of fiduciary duties owed to a corporation and the taking of excessive compensation could be characterized as a lawsuit for fraud or for the recovery of personal property, both actions with a six-year statute of limitations. *INB Nat'l Bank v. Moran Elec. Serv. Inc.,* 608 N.E.2d 702, 708 (Ind.Ct.App.1993), *trans. denied.* We now join the fray and conclude that the two-year statute of limitations espoused in *Bacompt* is the appropriate statute of limitations.

Long ago, the Indiana legislature abolished the distinction between "actions at law and suits in equity" and further provided that statutes of limitations would apply to both. *Mack v. Am. Fletcher Nat'l Bank & Trust Co.,* 510 N.E.2d 725, 736 (Ind.Ct.App.1987), *reh'g denied, trans. denied.* "[T]he applicable statute of limitations is ascertained by identifying the na-

---

2. Ind.Code § 34–11–2–4.

3. Ind.Code § 34–11–2–7.

4. Ind.Code § 34–11–1–2.

ture or substance of the cause of action." *Whitehouse v. Quinn,* 477 N.E.2d 270, 274 (Ind.1985).

In support of its argument that a cause of action for breach of fiduciary duty has a two-year statute of limitations, the *Bacompt* panel relied on *Mack v. American Fletcher National Bank & Trust Company,* 510 N.E.2d 725 (Ind.Ct.App.1987). In *Mack,* this court declared that a cause of action for breach of trust is a claim for breach of fiduciary duty and, like all claims for breach of fiduciary duty, is a tort. 510 N.E.2d at 738–39. This court in *Mack* went on to declare that the substance of the cause of action for breach of fiduciary duty in general and breach of trust in particular is a remedy for injury to personal property. *Id.* at 739. This court then concluded that the applicable statute of limitations for breach of fiduciary duty is the two-year statute that controls claims for injuries to personal property. *Id.* In *Malachowski v. Bank One, Indianapolis,* 590 N.E.2d 559, 563 (Ind.1992), our Indiana supreme court "agree[d] with this conclusion and the legal reasoning that leads to it."

Based on our supreme court's agreement with the outcome and the legal reasoning applied in *Mack,* we find that the *Bacompt* panel was correct in concluding that breach of fiduciary duty is a tort claim for injury to personal property with a two-year statute of limitations. Therefore, we find that the trial court was correct in applying a two-year statute of limitations to Shriner's claim for excessive compensation. However, Shriner filed suit on December 13, 1996; therefore, a portion of Shriner's claim was made within the appropriate time. Thus, we must also decide if the trial court erred in ruling that laches barred Shriner's claim of excessive compensation.

## B. Laches

Laches is an equitable doctrine that may not be applied arbitrarily or in the absence of conformity with general principles of equity. *Lowry,* 590 N.E.2d at 621. Laches is comprised of three elements: inexcusable delay in asserting a right; an implied waiver arising from knowing acquiescence in existing conditions; and, a change in circumstances causing prejudice to the adverse party. *Id.* A trial court has considerable latitude in deciding whether to invoke laches, and its decision will not be reversed on appeal absent an abuse of that discretion. *Estate of Dorothy Gerke v. Estate of Elmer Gerke,* 580 N.E.2d 972, 976 (Ind.Ct.App. 1991).

In this case, the trial court found that beginning in 1985 Shriner knew exactly what Sheehan paid himself and actually used the information about Sheehan's salary to calculate his own 2% incentive bonus. The trial court also found that "Shriner complained only once to Sheehan about his salary, but that was not until 1993." Appellant's App. p. 52. These findings establish that there was a lapse in time before Shriner filed his claim of excessive compensation and that, aside from his one complaint, Shriner knowingly acquiesced to Sheehan's increased salary.

However, acquiescence and a lapse of time alone do not constitute laches; there must also be prejudice of some sort, and that is the element that we find lacking in this case. The party seeking the application of laches to bar a claim must have been prejudiced by a change in condition due to the delay. *Gerke,* 580 N.E.2d at 977. The prejudice element requires that Sheehan and the Business materially altered their position due to Shriner's delay in objecting to the amount of Sheehan's salary. *Id.* In concluding that Shriner's excessive compensation claim is

barred by laches, the trial court declared, "allowing Shriner to complain now would be prejudicial to Sheehan." Appellant's App. p. 52. However, the trial court did not explain how Shriner's claim would be prejudicial, and we are at a loss to see where the prejudice lies.

The Defendants point to the fact that during Shriner's employment, Shriner added back into net profits Sheehan's salary in excess of $200,000 for the purpose of calculating his 2% incentive bonus. The Defendants alleged that if Shriner had always claimed that he was due a portion of Sheehan's salary as an ownership distribution, then Sheehan would have stopped paying Shriner the 2% employee incentive bonus after Shriner's original three-year employment contract expired. The Defendants assert that it would be unjust to allow Shriner to claim a portion of Sheehan's salary as an ownership distribution after adding it back over the years for purposes of calculating his employment bonus. We disagree.

Shriner essentially wore two hats during his employment with the Business; he was employee and a part-owner. As an employee, Shriner was entitled to 2% of the profits of the Business as an incentive bonus, but he was also entitled to 10% of the distributions as a part-owner of the Business. The add-back feature of the 2% incentive bonus insured that an excessive salary could not eat into the profits so as to make the profits and, as a consequence, the 2% bonus nonexistent. The add-back feature protected the 2% incentive bonus against an excessive salary; it was not a green light for a salary increase. Moreover, the incentive bonus was in effect before the time that Shriner claims Sheehan's salary became excessive. Even though Sheehan continued to pay himself his desired salary, there was no change in position because of Shriner's delay in claiming that Sheehan's salary was excessive. Shriner's delay did not materially alter the Defendant's position; therefore, we do not find any prejudice resulting from the delay.[5]

■ Thus, we conclude that the trial court abused its discretion in finding that Shriner's claim for excessive compensation was barred by laches. On the issue of excessive compensation, we remand to the trial court with instructions to determine whether Sheehan's salary was excessive and constituted disguised ownership distributions from December 13, 1994 to August 27, 1996.

### IV. Misuse of Personnel and Assets

Shriner also argues that the trial court erred in ruling that his claim of misuse of Business personnel and assets was barred by the statute of limitations and the equitable doctrines of laches and unclean hands. Shriner's underlying claim is that the trial court should treat the uncompensated use of the Business's employees at Shadeland Dome as a shareholder distribution and pay Shriner a portion of the value of those services. However, because we find the issue of unclean hands to be dispositive in this case, we will only address that issue.

■ The unclean hands doctrine is an equitable tenet, which demands one who seeks equitable relief to be free of wrongdoing in the matter before the court. *Ruder v. Ohio Valley Wholesale, Inc.*, 736 N.E.2d 776, 780 (Ind.Ct.App.2000). The doctrine of unclean hands is not favored by the courts and must be applied with reluc-

---

5. We note that when Defendants' counsel was repeatedly asked during oral argument if there was any other type of prejudice that could have resulted from Shriner's delay, counsel was at a loss.

tance and scrutiny. *Wagner v. Estate of Fox*, 717 N.E.2d 195, 202 (Ind.Ct.App. 1999). For the unclean hands doctrine to apply, the party who is charged with having unclean hands must be guilty of intentional misconduct. *Id.* The alleged wrongdoing must also have an immediate and necessary relation to the matter being litigated. *Ruder*, 736 N.E.2d at 780.

 In this case, Shriner is seeking equitable relief from Sheehan's uncompensated use of the Business's employees in the operation of the Shadeland Dome. Sheehan bought the hotel in 1987 and originally gave Shriner a percentage in it; however, within a year Shriner declined any ownership interest in the Shadeland Dome. Periodically, Sheehan had the Business's employees, including Shriner, do work for the Shadeland Dome without reimbursing the Business for these services. Shriner knew that the Business's employees were doing work for the Shadeland Dome and that the Business was not being compensated for these services, but he never asked that the Business be compensated. More importantly, the trial court found that "Business employees also did work for companies that Shriner owned, including an alarm company and Rapid Collections. The [Business] was not compensated for all of the work performed for these companies." Appellant's App. p. 39. The trial court also found that Shriner placed his father on the Business's payroll even though his father did not do any work for the Business. Based on the trial court's findings, we conclude that Shriner engaged in intentional misconduct of the same nature for which he is now seeking equitable relief. Therefore, we conclude that the trial court did not abuse its discretion in finding Shriner's claim barred by the doctrine of unclean hands.

## V. Constructive Fraud

Shriner's next argument is that the trial court erred in rejecting his constructive fraud claim when it found that there was no misrepresentation and that the claim was also barred by laches. We find that the trial court correctly determined that there was no material misrepresentation.

Sheehan and Shriner each owned one-third of Rapid Collections with Simala. In 1993, Sheehan became concerned that Simala's behavior toward Rapid Collections' employees could lead to a lawsuit, and he told Shriner that he thought the two should no longer be shareholders in Rapid Collections. Sheehan represented to Shriner that money coming in from Rapid Collections would not be lost after the sale because Rapid Collections' ownership distributions would still be paid to the Business. Sheehan also told Shriner that it was in the Business's long-term interest and Shriner's long-term interest that they sell their shares of Rapid Collections. Shriner and Sheehan sold their stock interest in Rapid Collections for their remaining capital contribution. Shriner now claims that he would not have sold his interest in Rapid Collections if he had believed that Sheehan would terminate his employment three years later and that through Sheehan's representations, Sheehan perpetrated a constructive fraud.

 To prove a claim of constructive fraud, the following elements need to be established:

(1) a duty owing by the party to be charged to the complaining party due to their relationship; (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advan-

tage by the party to be charged at the expense of the complaining party.

*Shelly & Sands,* 756 N.E.2d at 1077 (quoting *Rice v. Strunk,* 670 N.E.2d 1280, 1284 (Ind.1996)). Constructive fraud requires the misrepresentation of past or existing fact; statements of opinion and representations as to the future are not actionable. *Pugh's IGA, Inc. v. Super Food Servs., Inc.,* 531 N.E.2d 1194, 1198 (Ind.Ct.App. 1988), *reh'g denied, trans. denied.*

██ Sheehan told Shriner that it was in his long-term interest to sell his shares of Rapid Collections. That Shriner relied on this statement to assume that he should sell his shares in Rapid Collections because he would never lose his job with the Business does not make Sheehan's statement a deceptive material misrepresentation of past or existing fact. This statement was, at most, Sheehan's opinion of what the future would bring. Therefore, we find that the trial court properly rejected Shriner's claim of constructive fraud.

### VI. Insurance Policy

Finally, Shriner argues that the trial court erred in using its equity power to order Shriner to surrender the whole life policy on Sheehan's life to the insurance company and receive the cash surrender value or to sell it to the Business for the cash surrender value. To insure that, upon Sheehan's death, Shriner would have sufficient funds to cover all or at least a significant portion of the purchase price of Sheehan's interest in the Business, the Business purchased two insurance policies on Sheehan's life and put them in Shriner's name. The Business paid the premiums on the policies, but Shriner paid taxes on the financial benefit he received as a result of the insurance being purchased for him. After Shriner's termination, the term life insurance policy was canceled because the Business quit paying the premiums; however, Shriner took loans out on the whole life insurance policy in order to pay its premiums.

With respect to the administration of the insurance policies, Shriner and Sheehan entered into a Split Dollar Insurance Agreement. The parties final agreement with respect to the insurance was memorialized in an August 29, 1994 Amendment to Split Dollar Insurance Agreement (Insurance Agreement). The Insurance Agreement provided that Shriner "shall be the sole and absolute owner of the Policy." Appellant's App. p. 565. The Insurance Agreement also provided that Shriner "has the sole and exclusive right to surrender or cancel the Policy." Appellant's App. p. 565. The Insurance Agreement went on to add that, if the Policy was terminated during Sheehan's life, the Business was entitled to the lesser of either the premiums that it had paid or the cash value of the insurance policies. However, the Insurance Agreement did not specify what would happen to the policies if Shriner was involuntarily terminated from his employment with the Business.

In crafting its equitable remedy on this issue, the trial court found that Shriner was the equitable owner of the whole life insurance policy but, in light of his termination with the Business, "Shriner has no right or opportunity to purchase Sheehan's stock in the future, Shriner no longer has any reason to have the insurance on Sheehan's life." Appellant's App. p. 55. The trial court then concluded that Shriner should surrender the whole life insurance policy to the Business or the insurance company because he no longer had a valid purpose for having an interest in the life or death of Sheehan. However, the trial court ruled that Shriner should be able to keep the cash surrender value of the policy because of his ownership interest in the policy.

■ The trial court's equitable remedy was to order Shriner to give up the insurance policy while allowing him to keep all of the cash surrender value without reimbursing the Business for the premiums that it paid. The Insurance Agreement did not provide for the situation in which Shriner would be terminated from his employment. While recognizing that the original purpose for the purchasing of the policy was frustrated, the trial court's remedy also honored Shriner's property interest in the policy by allowing him to keep the entire cash surrender value. The trial court's remedy honored the parties' interests and did not contradict any clear agreement between the parties. Therefore, we conclude that the trial court did not abuse its discretion in crafting this remedy.

### Conclusion

In conclusion, we find that the trial court erred in concluding that book value was the proper valuation formula in determining the buy-out value of Shriner's shares of stock and in concluding that Shriner's claim of excessive compensation was fully barred by a two-year statute of limitations and laches. Thus, we remand with instructions for the trial court to determine the value of the Business's shares of stock based on the Business's fair market value as of July 31, 1996, in addition to any accumulated interest and to determine whether Sheehan's salary was excessive and constituted disguised ownership distributions from December 13, 1994 to August 27, 1996. On all other issues, we affirm the trial court's judgment.

Affirmed in part, reversed in part, and remanded with instructions.

BAKER, J., and RILEY, J., concur.