Lydia ESCOBEDO, et al.,
Appellants–Plaintiffs,

v.

BHM HEALTH ASSOCIATES, INC., AAA Health Care/Rocky Mountain Home Care, Donna Huddleston, and Leona Bonczek, Appellees–Defendants.

No. 45A03–0211–CV–383.

Court of Appeals of Indiana.

Oct. 29, 2003.

Nathaniel Ruff, Merrillville, IN, Attorney for Appellants.

James L. Clement, Jr., Emery Clement & Schmidt, P.C., Merrillville, IN, Attorney for Leona Bonczek.

Phillip A. Norman, Phillip A. Norman, P.C. Valparaiso, IN, Attorney for AAA Home Care, LLC, AAA Health Care/ Rocky Mountain Home Care, d/b/a BHM Health Associates, Inc.

James A. Greco, Greco Bishop Kuechenberg, Merrillville, IN, Attorney for Donna Huddleston.

**OPINION**

MATHIAS, Judge.

The employees ("Employees") of BHM Health Associates, Inc. ("BHM") filed suit in the Superior Court of Lake County against BHM, Donna Huddleston ("Huddleston"), Leona Bonczek ("Bonczek"), and AAA Health Care, LLC ("AAA"). The trial court ruled in favor of the Employees with respect to their claims against BHM, but also ruled in favor of Huddleston, Bonczek, and AAA. The Employees appeal, presenting the following restated issues for review:

I.  Whether Huddleston and Bonczek are entitled to the protection of BHM's corporate status; and,

II.  Whether the BHM purchase agreement ("Agreement") renders AAA liable for BHM's wage obligations that accrued prior to January 31, 1997.

Concluding that Huddleston and Bonczek are not entitled to the protection of BHM's corporate status but that the Agreement does not render AAA liable, we affirm in part and reverse in part.

**Facts and Procedural History**

BHM is a defunct Indiana health service corporation. Huddleston and Bonczek were its co-owners and directors. BHM failed to forward employee tax withholdings to the Internal Revenue Service ("IRS"). Consequently, the IRS permitted BHM to remain open contingent upon Bonczek and Huddleston's personal guarantee for the arrearages. As such, BHM made monthly payments of $30,000 to the IRS.[1]

On February 1, 1997, Bonczek and Huddleston negotiated the sale of BHM to Rocky Mountain Home Care ("Rocky

---

1. Huddleston and Bonczek's salaries were   roughly $100,000 per year.

Mountain"), a Utah non-profit corporation.[2] Rocky Mountain created an Indiana entity, AAA, to buy BHM. Before BHM's sale, Huddleston and Bonczek used the remaining BHM assets to pay $70,000 that was still owed to the IRS, leaving no remaining funds to pay employees for work performed during the last two weeks of January 1997. Furthermore, BHM failed to turnover $6,406.76 in union dues.[3]

The Employees filed suit against BHM, AAA, Bonczek, and Huddleston to recover unpaid wages and statutory penalties. The trial court ruled in favor of the Employees with respect to their claim against BHM, but also ruled in favor of Huddleston, Bonczek, and AAA. The Employees now appeal.

## I. Piercing the Corporate Veil

In rendering its judgment, the trial court made findings of fact and conclusions of law. When a trial court has made findings, the reviewing court may affirm the judgment on any legal theory supported by the findings. *Shriner v. Sheehan*, 773 N.E.2d 833, 841 (Ind.Ct.App. 2002), *trans. denied.* The court on appeal shall not set aside the findings or judgment unless clearly erroneous; however, while we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* (citing *Menard, Inc. v. Dage–MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind.2000)). We evaluate questions of law de novo. *Id.*

It is well settled that Indiana courts are reluctant to disregard a corporate entity; however, we may do so to prevent unfairness to third parties. *Oliver v. Pinnacle Homes, Inc.*, 769 N.E.2d 1188,

1191–92 (Ind.Ct.App.2002), *trans. denied* (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1232 (Ind.1994)). When a court exercises its equitable power to "pierce the corporate veil," it engages in a highly fact-sensitive inquiry. *Id.* The plaintiff bears the burden of proof with respect to piercing the corporate veil. *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994).

To decide whether plaintiff has met this burden, we consider whether the plaintiff has presented evidence showing: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Id.* Several *Aronson* factors potentially are triggered by Bonczek and Huddleston's use of BHM assets; however, we only deem it necessary to consider the "use of a corporation to promote fraud, injustice, or illegal activities" factor.

Bonczek and Huddleston rely upon (1) the trial court's determination that the IRS payment was made on a corporate debt rather than a personal one, (2) the claim that they were only "incidentally" benefited by the IRS payment, and (3) their claim that they personally guaranteed the tax arrearage in some sort of

---

2. Huddleston resigned her position; Bonczek and BHM's employees went to work for AAA.

3. Appellants make averments, based upon deposition testimony, that are not included in this opinion's statement of facts. Though the Appellants claim to have included the relevant deposition testimony in their appendix, we are unable to locate such testimony. Because these averments are unnecessary for the proper resolution of this case and we already have issued one order to supplement the record, we will proceed without relying on the averments in question.

magnanimous attempt to keep BHM afloat.[4] However, Bonczek and Huddleston were the sole shareholders of BHM and designated $100,000 salaries for themselves. It is abundantly clear that these salaries were subsidized by their decisions to forego BHM's tax obligations. As such, there is a direct nexus between Bonczek and Huddleston's salaries and their personal guarantee of BHM's tax arrearages.

Because Bonczek and Huddleston effectively absconded with BHM employee wages to pay off the arrearage—a debt that arose at least in part from their efforts to subsidize larger salaries for themselves—it would promote substantial justice to deny them the protection of BHM's corporate status.[5] Accordingly, we reverse the decision of the trial court and extend the trial court's finding of BHM's liability to Bonczek and Huddleston, personally, jointly, and severally.

## II. AAA's liability

Construction of the terms of a written contract is a pure question of law, and we conduct a de novo review of the trial court's conclusions in that regard. *Shriner*, 773 N.E.2d at 841. Section 7.01 of the Agreement states:

*Labor and Employment Claims.* SELLER shall indemnify, defend and hold BUYER harmless from and against all labor or employment claims, liabilities or obligations relating to the Business which accrued prior to, or which arise out of events occurring prior to midnight on January 31, 1997.

Appellants' App. p. 30. Exhibit "G" of the Agreement states the "ASSIGNEE hereby assumes any and all duties and obligations of ASSIGNOR under said Contract which become due and owing after midnight on January 31, 1997." Appellants' App. p. 44.

The Employees contend that because their wages were "due and owing" after January 31, 1997, AAA is liable under the terms of the Agreement. Tellingly, the Employees' analysis fails to include a term of the contract. Exhibit "G" states AAA will be liable for wages which *"become* due and owing" after midnight on January 31, 1997. Appellants' App. p. 44. Although the Employees wages were "due and owing" after January 31, 1997, they did not *"become* due and owing" after January 31, 1997; the wages accrued as the Employees completed their work. Exhibit "G" is not inconsistent with section 7.01, which unmistakably places liability for the disputed wages on BHM.[6]

---

4. Bonczek and Huddleston also note they were not receiving a salary during the last months of BHM's existence. We give no weight to this consideration. The months they went without a salary were the direct result of their having paid previously themselves salaries to which they were not entitled.

5. Because we conclude that there also was a nexus between BHM's unpaid union dues and the salaries, it would also be an injustice for Bonczek and Huddleston to receive the protection of BHM's corporate status in this matter as well.

6. The Employees contend that we should consider extrinsic evidence indicating no money was exchanged for BHM's purchase. They assert that because section 3.01.03 of the Agreement allocates $125,000 for the purchase of employment contracts and no money was exchanged, the $125,000 was intended to cover BHM's unpaid wages—thus, indicating AAA's liability. Because the intent of the parties is evident from the four corners of the Agreement, we need not consider this theory. However, we note this theory is unpersuasive. 125,000 dollars is more than triple the amount due to the employees. Moreover, sections 3.01.01, 3.01.02, and 3.01.04 of the Agreement also list purchase prices; the assertion that neither these amounts nor the $125,000 were paid strongly suggests that the reason the $125,000 was not paid had nothing to do with BHM's pre-January 31, 1997 employment liabilities. Appellants' App. p. 25.

## Conclusion

Sufficient evidence was presented to pierce BHM's corporate veil and hold Bonczek and Huddleston individually liable, jointly and severally, but the Agreement does not render AAA liable for BHM's unpaid wages.

Reversed in part and affirmed in part.

NAJAM, J., and ROBB, J., concur.