

FILED

Sep 14 2017, 6:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Robert Madison Oakley
Daniel Kyle Dilley
Carmel, Indiana

ATTORNEYS FOR APPELLEES

Anthony L. Holton
Reminger Co., LPA
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Evelyn Messmer, *Appellant-Plaintiff,* | September 14, 2017 |
| | Court of Appeals Case No. 53A01-1701-PL-139 |
| v. | Appeal from the Monroe Circuit Court |
| KDK Financial Services, Inc., *et al.*, *Appellees-Defendants.* | The Honorable E. Michael Hoff, Judge |
| | Trial Court Cause No. 53C01-1508-PL-1598 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Plaintiff, Evelyn Messmer (Messmer), appeals the trial court's summary judgment in favor of Appellees-Defendants, KDK Financial Services, Inc. (KDK Financial) and Fred Kern (Kern), Individually (collectively, Appellees).[1]

We affirm.

## ISSUES

Messmer raises two issues for our review, which we restate as:

(1) Whether the continuing representation doctrine tolled the statute of limitations on Messmer's fraud allegations; and

(2) Whether a genuine issue of material fact exists establishing that Appellees fraudulently misrepresented the surrender of an insurance annuity.

## FACTS AND PROCEDURAL HISTORY

At the time of the trial court proceedings, Messmer was eighty-eight years old and resided in an assisted living community. She began using the services of KDK Financial in 2002, shortly after her husband died. KDK Financial is in

---

[1] A third defendant, Dwight Wade, did not file a motion for summary judgment before the trial court or join in the proceedings.

the business of selling fixed annuities,[2] an insurance product which is not considered a security under Indiana law. Throughout the entire time Messmer used KDK Financial's services, Messmer primarily interacted with Dwight Wade (Wade), and occasionally spoke with Kern. By 2007, Messmer had purchased six fixed annuities through KDK Financial: five of the annuities were issued by Allianz Insurance (Allianz), with the remaining annuity issued by Washington National Insurance Company (Washington National).

[5] As of January 10, 2007, the policy details for the Allianz annuities included both the account value, as well as the value of the accounts upon surrender. Between December 28, 2007, and April 15, 2008, Messmer surrendered her Allianz annuities and purchased five new fixed annuities issued by Athene. On November 19, 2008, Messmer mailed a signed grievance to Allianz, requesting a reduction in the surrender charges incurred due to the early surrender of her five Allianz annuities. Mesmer's letter to Allianz stated, in pertinent part, as follows:

> The manner in which I was notified by Allianz as to the amount of surrender charges which I would incur was deceiving. For example, regarding policy number 70456119; I received a letter stating the amount of money being sent to the new company was $33,070.76. It did not state nor specify that I was losing

---

[2] An annuity is defined by the Securities and Exchange Commission as "a contract between you and an insurance company that is designed to meet retirement and other long-range goals, under which you make a lump-sum payment or series of payments. In return, the insurer agrees to make periodic payments to you beginning immediately or at some future date." https://www.sec.gov/answers/annuity.htm (last visited Aug. 15, 2017).

$15,621.30. The same procedure was used for the other four policies. I was not told that I was losing the bonus nor was I told what the surrender charge actually was.

I believe you should have been straight forward with our transactions and advised me in clear and comprehensible terms which I could understand. If I had known what the actual surrender charges were, I would not have proceeded with the new deal. The manner in which Allianz sends notification of surrender charges is devious, confusing and wrong. I expected a reasonable charge. My hope is after reviewing my complaint Allianz will refund some of my surrender charges. A 10% surrender charge is reasonable.

(Appellees' App. p. 244).

[6] On January 14, 2007, Messmer purchased, through KDK Financial, a Washington National fixed annuity. The policy was sent to Messmer on January 25, 2007, and included a "Table of Surrender Charge Percentages," setting forth the applicable surrender charges to be incurred upon early surrender. (Appellees' App. p. 215). On November 7, 2011, Messmer executed a Washington National Surrender/Withdrawal Form to surrender her Washington National annuity. Immediately preceding Messmer's signature, the form contained the following acknowledgments:

• I understand there may be contractual surrender charges associated with this transaction.

. . . .

- [Washington National] and its representatives do not give legal or tax advice. This information simply reflects our understanding of the tax rules and regulations in effect at the time of publication. Please consult your personal tax advisor regarding annuity taxation as it applies to you.

(Appellees' App. p. 241). Prior to effecting the surrender, Washington National mailed Messmer a Confirmation Request, advising her of the surrender charges and potential tax consequences as follows:

> Because an annuity is intended as a long-term financial vehicle, policyholders who surrender or transfer their annuity in the beginning years may incur losses that could take years to recoup. If your annuity were surrendered today, $191,635.22 would be paid, which includes a surrender charge of $30,441.92, in addition to other penalties and/or adjustments. Also, please remember that your annuity grows tax-deferred until you access your values, unlike back CDs, money markets and most bonds.
>
> . . . .
>
> If, once you have had an opportunity to consider this information, you still want to surrender your contract, please sign and return the Surrender/Transfer Confirmation Request below to our administrative office. Once received, we will complete your request.

(Appellees' App. p. 242). On November 23, 2011, Messmer executed an application for an Aviva annuity as a gift to her son, Ronald Messmer (Ronald). Thereafter, on March 20, 2014, the policy purchased in Ronald's name, was transferred to Messmer, effectively replacing the Washington National annuity with the Aviva annuity.

[7] In addition to providing financial services, Appellees also aided Messmer with her estate planning, including the creation of a trust. While Messmer complains that she never met an attorney during the process, she also admits that she has no knowledge about who actually drafted the documents. The creation of the trust disqualified Messmer to receive Veteran Affairs' (VA) benefits.

[8] On August 24, 2015, Messmer filed her Complaint against KDK Financial, Kern, and Wade for the unauthorized practice of law and two Counts of fraud. Messmer's allegation of unauthorized practice of law was dismissed by the trial court on November 17, 2015, because no private right of action exists with respect to this charge. On August 5, 2016, KDK Financial and Kern filed a motion for summary judgment, to which Messmer responded on September 12, 2016. On November 30, 2016, the trial court conducted a hearing on the motion for summary judgment. Thereafter, on December 19, 2016, the trial court entered summary judgment in favor of KDK Financial and Kern. In its summary judgment, the trial court concluded that "the six year statute of limitation has passed with respect to the five Allianz transactions." (Appellant's App. p. 7). With respect to the Washington National policy, the trial court found that "the evidence establishe[d] without a dispute that [Messmer] was informed of the surrender charges she would incur before she chose to surrender the Washington National [p]olicy, and [Appellees] are not therefore liable for fraud or misrepresentation." (Appellant's App. p. 7).

[9] Messmer now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). "A fact is material if its resolution would affect the outcome of the case, and an issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth . . . , or if the undisputed facts support conflicting reasonable inferences." *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009).

In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id*. When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id*. Accordingly, the grant of summary

judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id.*

[12] We observe that, in the present case, the trial court entered findings of fact and conclusions of law in support of its judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). However, such findings offer this court valuable insight into the trial court's rationale for its review and facilitate appellate review. *Id.*

## II. *Continuing Representation Doctrine*

[13] Not disputing the application of the six-year statute of limitations on fraud allegations, Messmer nevertheless contends that its application was tolled by the continuing representation doctrine. Although Indiana has not yet applied the doctrine to the financial services realm or allegations sounding in fraud, Messmer advocates for the extension of the theory to KDK Financial and Kern, "who while acting in a fiduciary capacity" "provided advise [sic] and direction to [Messmer] with respect to her investments which resulted in tax liability and losses to [Messmer] while resulting in economic gain to [KDK Financial and Kern]." (Appellant's Br. p. 11).

[14] Actions for relief against fraud "must be commenced within six years after the cause of action accrues." Ind. Code § 34-11-2-7. Under Indiana's discovery rule, a cause of action accrues, and the statute of limitations begins to run, when the plaintiff knew or, in the exercise of ordinary diligence, could have

discovered that an injury has been sustained as a result of the tortious act of another. *Doe v. United Methodist Church*, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996), *trans. denied*. For a cause of action to accrue, it is not necessary that the full extent of the damage be known or even ascertainable but only that some ascertainable damage has occurred. *Id*. It is undisputed that Messmer was aware of the surrender charges on the Allianz policies on November 2008, as evidenced by her letter to the insurance company. As such, she was required to file her fraud allegations by November 2014; instead, she filed her Complaint on August 24, 2015, and therefore, any fraud claim with regard to the Allianz policies is barred. However, the statute of limitations did not bar a fraud allegation with respect to Messmer's surrender of the Washington National policy on November 7, 2011, which was filed within four years of the discovery.

[15] Messmer now attempts to circumvent the statute of limitations on the Allianz policies by contending that its application was tolled by the continuous representation theory. Originally developed in the realm of legal malpractice and negligence, the continuous representation doctrine provides that the applicable statute of limitations does not commence until the end of an attorney's representation of a client in the same matter in which the alleged malpractice occurred. *Biomet, Inc. v. Barnes & Thornburg*, 791 N.E.2d 760, 765 (Ind. Ct. App. 2003), *trans. denied*. In *Bambi's Roofing Inc. v. Moriarty*, 859 N.E.2d 347, 357 (Ind. Ct. App. 2006), we expanded the continuous representation rule to the accounting profession, limiting its application to the

accountant's representation in the same, specific matter. The purpose of the rule is to give accountants an opportunity to remedy their errors, establish that there was no error, or attempt to mitigate the damage caused by their errors, while still allowing the aggrieved client the right to later bring a malpractice action, and not to circumvent the statute altogether by continuously representing the client. *Id.* at 358. Without citing to any precedents, Messmer now advocates to expand the doctrine to the financial services sector in general and to allegations based in fraud.

[16] This court received a similar expansion request in our very recent case of *Landmark Legacy, L.P. et al. v. Runkle, et al.*, 2017 WL 3429076 (Ind. Ct. App. Aug. 10, 2017), in which we declined to extend the continuous representation doctrine to a negligence claim against financial advisors. In fact, we noted that:

> Most importantly, Runkle [the financial planner] is neither an attorney nor a certified public accountant. Appellants cannot point to any precedents that would suggest the continuous representation doctrine applies to the provision of financial services, nor can they proffer a rational argument for extending the continuous representation theory to include financial advisors.

*Id.*

[17] Similarly here, Messmer fails to cite any case law persuading us to expand the continuous representation doctrine not only to brokers of financial services and fixed annuities, but also, most importantly, to the realm of fraud allegations. In

the more than fifty years of the doctrine's existence,[3] no single state has extended the doctrine as Messmer advocates. The rationale of the application of the continuous representation doctrine in negligence claims—where a client allows an attorney or accountant to correct a good faith mistake without losing the client's confidence—is simply incompatible with fraud allegations. "Certainly, once the client discovers the attorney's fraud, it is not reasonable to expect the client to continue to maintain confidence in the professional's good faith and the client should be, as are all other victims of fraud, required to investigate and access the facts." *Endervelt v. Slade*, 618 N.Y.S.2d 520, 525 (N.Y. Sup. Ct. 1994). Under the circumstances of this case, we decline Messmer's request to expand the continuous representation doctrine.

### III. *Washington National Annuity*

[18]  With respect to the Washington National annuity, Messmer contends for the first time on appeal that KDK Financial and Kern breached their fiduciary duty to her and are thus liable for constructive fraud with regard to Messmer's surrender of the Washington National policy. In her Complaint and response to the motion for summary judgment, Messmer claimed actual fraud due to perceived false statements, not constructive fraud based on a breach of fiduciary duty.[4] Indiana Trial Rule 9(B) expressly requires that "all averments of fraud"

---

[3] New York pioneered the continuous representation doctrine in *Borgia v. New York*, 187 N.E.2d 777 (N.Y. Ct. App. 1962).

[4] Actual fraud and constructive fraud are two separate and distinctive causes of action, each requiring a showing of different elements. *See Heyser v. Noble Roman's Inc.*, 933 N.E.2d 16, 19-20 (Ind. Ct. App. 2010),

be specifically pled. At no point during the proceedings before the trial court did Messmer claim constructive fraud or even make a start to raise constructive fraud allegations; rather, all her allegations were based on misrepresentations and fraudulent inducement. "Issues not raised before the trial court on summary judgment cannot be argued for the first time on appeal[.]" *Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 388(Ind. Ct. App. 2004). Accordingly, Messmer waived her claim on appeal. *See id.*

[19] Waiver notwithstanding, we will address Messmer's claim on its merits. A claim for constructive fraud succeeds if the following five elements are established: 1) a duty owed by the party to be charged to the complaining party due to their relationship; 2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; 3) reliance thereon by the complaining party; 4) injury to the complaining party as a proximate result thereof; and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Heyser v. Noble Roman's Inc.*, 933 N.E.2d 16, 19-20 (Ind. Ct. App. 2010), *trans. denied*. Constructive fraud requires the misrepresentation of a past or existing fact; statements of opinion and representations as to the future are not

---

(outlining the different elements between the two causes), *trans. denied*. Actual fraud is an intentional tort, requiring knowledge or reckless disregard of falsity, whereas constructive fraud is an unintentional tort, which arises by operation of law from a course of conduct that, if sanctioned by law, would secure an unconscionable advantage. *See id.*

actionable. *Shriner v. Sheehan*, 773 N.E.2d 833, 849 (Ind. Ct. App. 2002), *trans. denied*.

[20] Messmer argues that she "had been instructed that she could temporarily add her son's name to her policy due to her age, trusted the individuals giving her said advise [sic], and signed the documents which were presented to her." (Appellant's Br. p. 12). Specifically, Messmer contends to have "lacked understanding of the effect of the surrender at the time it was made." (Appellant's Br. p. 12). The designated evidence reflects that during her deposition, Messmer was unable to articulate details concerning the transaction, including what she was told, by whom, and when, which would have established the groundwork for a fraud contention. Furthermore, the evidence establishes that Messmer had actual knowledge about the surrender charges of the Washington National policy and its tax consequences. Prior to effecting the surrender, Washington National mailed Messmer a Confirmation Request, advising her of the surrender charges and potential tax consequences. Then, on November 7, 2011, Messmer executed a Washington National Surrender/Withdrawal Form to surrender her Washington National annuity. Immediately preceding Messmer's signature, the form contained the acknowledgement that she understood "there may be contractual surrender charges associated with this transaction." (Appellees' App. p. 241). Moreover, representations of prospective tax liability are representations of future consequences which cannot predicate a constructive fraud claim. *See id.*

In addition, Messmer asserts that she did not complete substantive portions of the documents which established the Aviva annuity in Ronald's name, but that these documents were completed for her by Kern. The designated evidence indicates that Messmer simply could not "remember anything" about Kern's involvement in purchasing the Aviva annuity. (Appellant's App. p. 104). Accordingly, we affirm the trial court's summary judgment in favor of Appellees.[5]

## CONCLUSION

Based on the foregoing, we conclude that the continuing representation doctrine is not applicable to financial advisors or fraud allegations; and no genuine issue of material fact exists establishing that Appellees fraudulently misrepresented the surrender of an insurance annuity.

---

[5] Messmer also argues, in addition to the fraudulent purchase and sale of fixed annuities, that Appellees fraudulently advised her with her estate planning. She asserts that Appellees prepared estate planning documents without the aid of an attorney, which resulted in a failure to properly shelter her assets in a trust, causing her to lose VA benefits due to her asset level. Our review of the trial court's summary judgment discloses that the Order did not address this claim. Rather, it appears the trial court included this argument within Messmer's overarching claim of "unauthorized practice of law by preparing a trust and other legal documents," which the court had "previously ordered dismissed." (Appellant's App. p. 6). In addition, the trial court concluded that it "decline[d] to extend the continuing representation doctrine to financial advisors such as Defendants even if they engaged in the unauthorized practice of law." (Appellant's App. p. 7). Even if we were to address Messmer's fraud claim in the preparation of estate planning documents, she would not be successful. Actionable fraud requires a showing that Appellees were compensated or gained some other advantage. *See Heyser*, 933 N.E.2d at 19. In this regard, the designated evidence indicates that during her deposition, Messmer could not recall that Appellees "told [her] that they personally drafted the estate planning documents" and she could not remember paying Appellees "any money relating to the preparation of estate planning documents." (Appellant's App. pp. 261, 262). Accordingly, Messmer cannot point to any issue of material fact indicating that Appellees committed constructive fraud during the preparation of estate planning documents. Her claim fails.

[23] Affirmed.

[24] Robb, J. and Pyle, J. concur