

FILED

Aug 10 2017, 8:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Bradley Kim Thomas
Aaron Westlake
Thomas Law Firm, PC
Auburn, Indiana

ATTORNEYS FOR APPELLEES

Michael H. Michmerhuizen
Barrett McNagny, LLP
Fort Wayne, Indiana

Paul S. Sauerteig
Snow & Sauerteig, LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Landmark Legacy, LP and
Dennis W. Fahlsing,

*Appellants-
Plaintiffs/Counter Defendants,*

v.

Dennis Runkle, D.R. Financial,
Inc., and D.R. Financial Group,
Inc.,

*Appellees-Defendants/Counter-
Plaintiffs.*

August 10, 2017

Court of Appeals Case No.
02A04-1702-PL-347

Appeal from the Allen Superior
Court

The Honorable Craig J. Bobay,
Judge

Trial Court Cause No.
02D02-1411-PL-431

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants-Plaintiffs/Counter-Defendants, Landmark Legacy, L.P. (Landmark) and Dennis W. Fahlsing (Fahlsing) (collectively, Appellants), appeal the trial court's grant of attorney fees to Appellees-Defendants/Counter-Plaintiffs, Dennis Runkle (Runkle), D.R. Financial, Inc. (Financial) and D.R. Financial Group (Financial Group) (collectively, Appellees).

We affirm and remand.

# ISSUES

Appellants present us with four issues, which we consolidate and restate as the following single issue: Whether the trial court erred by awarding attorney fees to Appellees pursuant to Indiana Code section 34-52-1-1(b).

In their Appellate Brief, Appellees request this court to award appellate attorney fees pursuant to Indiana Appellate Rule 66(E).

# FACTS AND PROCEDURAL HISTORY

Around 2002, Fahlsing engaged the financial planning and asset protection services of Runkle, the owner of Financial. Runkle had worked as a financial planner since 1986 and created Financial in 2001, offering a "combined team" of CPAs and attorneys to "agree on a best solution" for his clients. (Transcript p. 12). Fahlsing especially inquired about limited partnerships and Runkle assisted Fahlsing and his then-wife, Linda Jackson (Jackson), in setting up a family limited partnership, named Shangela, L.P. Runkle advised Fahlsing and

Jackson about the duties and responsibilities of a general partner versus a limited partner and specifically informed them that they could not use partnership assets for their own personal use. However, during the bench trial, Fahlsing denied ever having received this advice, and instead maintained that Runkle had told him that he could freely dispose of the partnership assets. Although Attorney John Wray (Attorney Wray) prepared the documentation for Shangela, he did not consult with Fahlsing as to the purpose of the partnership, nor did he advise Fahlsing about his rights and responsibilities.

[6] In 2003, Runkle retired and moved to Florida. He ceased to have any ownership in Financial, which was taken over by Jim Miller (Miller) and Kris Hannah (Hannah), who had both previously worked with Runkle. In 2006, Miller and Hannah split, after which Hannah created Financial Group and moved the company to a new location. Runkle continued to work as a consultant for Financial Group.

[7] In late 2004 or early 2005, Fahlsing sought Runkle's assistance in setting up an additional limited partnership, known as Landmark. At the time, Runkle advised Fahlsing of his rights and responsibilities with regard to the partnerhip. At the bench trial, the parties disputed the substance of the advice rendered by Runkle. Again, Attorney Wray prepared the documentation for the creation of Landmark, but did not consult with Fahlsing as to the purpose of the partnership or as to Fahlsing's rights and responsibilities. Landmark was formed on February 8, 2005, with Fahlsing as 1% General Partner and 99% Limited Partner. On February 15, 2005, Fahlsing's interests in Landmark were

assigned to the 2005 Dennis Wayne Fahlsing Revocable Living Trust. The following day, Fahlsing's daughters, Angela Taylor (Angela) and Shannon Fahlsing (Shannon), were each given 44% limited partnership interests in Landmark.

[8] Between 2005 and 2009, after the creation of Landmark, Fahlsing executed twenty-one promissory notes whereby he personally agreed to repay Landmark for loans he had taken from Landmark which were collateralized by titles of certain motor vehicles. Runkle did not assist Fahlsing with the preparation of the promissory notes, nor did he recommend that Fahlsing execute these notes.

[9] On June 7, 2011, Angela and Shannon filed a lawsuit against Fahlsing and Landmark in the Dekalb Superior Court, alleging that Fahlsing had committed wrongful acts in his capacity as general partner of Landmark, including breach of fiduciary duties, failure to provide accounting, use of partnership assets for personal obligations, accepting an unreasonable salary, and failure to provide financial records. Shortly after receiving the complaint, Fahlsing met with Attorney Wray who represented him in the suit. At the time, Attorney Wray and Fahlsing discussed the rights and responsibilities of a general partner in a limited partnership. On June 29, 2011, Fahlsing filed a complaint against Angela and Shannon in the Noble Circuit Court seeking payment of the 44% limited partnership shares held by each of his daughters. In connection with this proceeding, Fahlsing filed an affidavit with the Noble Circuit Court wherein he affirmed under oath that he had assigned the limited partnership shares to his daughters in exchange for a loan. The Noble Circuit Court stayed

the case and ordered the parties to arbitration. Fahlsing was eventually able to settle the issue by granting Angela and Shannon each a $480,000 mortgage, secured by four real estate parcels owned by Landmark, in exchange for Angela's and Shannon's transfer of their respective 44% limited partnership shares to Fahlsing.

[10] On November 21, 2014, Fahlsing and Landmark filed their Complaint in the underlying matter, contending that Runkle, Attorney Wray, Financial, and Financial Group had breached their fiduciary duty, and had committed negligence and malpractice. On October 16, 2015, Runkle, Financial, and Financial Group filed a motion for summary judgment, as well as a motion for leave to file a counterclaim, alleging that Fahlsing's contentions were disputed by Jackson and his daughter and that the statute of limitations barred Appellants' claim. In addition, Runkle, Financial, and Financial Group requested an award of attorney fees for Appellants' groundless and frivolous litigation, pursuant to Ind. Code § 34-52-1-1. At the same time, Attorney Wray also filed a motion for summary judgment. On December 2, 2015, Appellants filed their answer and affirmative defenses to the counterclaim, and on December 18, 2015, they filed their memorandum in opposition to the respective motions for summary judgment.

[11] On January 12, 2016, the trial court conducted a hearing on the motions for summary judgment. On February 12, 2016, the trial court issued its summary judgment, finding that Financial Group was not liable for the actions of Financial based on the alter ego doctrine, and the statute of limitations barred

the claims against Runkle, Financial, and Financial Group. However, the trial court also concluded that because the continuous representation doctrine applied with respect to Attorney Wray, the statute of limitations did not bar Appellants' contentions against him. After Runkle, Financial, and Financial Group received summary judgment—which Appellants did not appeal—the trial court bifurcated the matter and allowed the counterclaim for attorney fees to proceed formally to trial. The trial court conducted a bench trial on the request for attorney fees on November 2, 2016. On January 20, 2017, the trial court issued its Order, concluding that Appellants' claims were frivolous, unreasonable, and groundless, and entered a judgment in favor of Appellees in the amount of $55,003.17.

[12]   Appellants now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I.   *Indiana Code section 34-52-1-1(b)*

[13]   Indiana follows the "American Rule," whereby parties are required to pay their own attorney fees absent an agreement between the parties, statutory authority, or other rule to the contrary. *Smyth v. Hester*, 901 N.E.2d 25, 32 (Ind. Ct. App. 2009), *reh'g denied, trans. denied*. Here, the trial court awarded fees pursuant to Indiana Code section 34-52-1-1. Specifically, subsection (b) of Indiana Code section 34-52-1-1, also known as the General Recovery Rule, provides:

> In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:

      (1) Brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;

      (2) Continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or

      (3) Litigated the action in bad faith.

Such a statutory award may be made "upon a finding" of any of the statutory bases. *Smyth*, 901 N.E.2d at 33.

[14] A claim is "frivolous" if it is made primarily to harass or maliciously injure another; if counsel is unable to make a good faith and rational argument on the merits of the action; or if counsel is unable to support the action by a good faith and rational argument for extension, modification, or reversal of existing law. *Dunno v. Rasmussen*, 980 N.E.2d 846, 850-51 (Ind. Ct. App. 2012). A claim is "unreasonable" if, based upon the totality of the circumstances, including the law and facts known at the time, no reasonable attorney would consider the claim justified or worthy of litigation. *Id*. at 851. A claim or defense is "groundless" if no facts exist which support the legal claim relied on and presented by the losing party. *Id*. However, an action is not groundless merely because a party loses on the merits. *Id*. Bad faith is demonstrated where the party presenting the claim is affirmatively operating with furtive design or ill will. *Id*.

[15] The trial court's decision to award attorney fees under I.C. § 34-52-1-1 is subject to a multi-level review: the trial court's findings of fact are reviewed under the clearly erroneous standard, and legal conclusions regarding whether the litigant's claim was frivolous, unreasonable, or groundless are reviewed *de novo*. *Purcell v. Old Nat'l. Bank*, 972 N.E.2d 835, 843 (Ind. 2012). In reviewing the findings of fact, we neither reweigh the evidence nor judge witness credibility, but rather we review only the evidence and reasonable inferences drawn therefrom that support the trial court's findings and decision. *Smyth*, 910 N.E.2d at 33. In reviewing under the clearly erroneous standard, we will not reverse unless we are left with a definite and firm conviction that a mistake has been made. *Id*. Finally, the trial court's decision to award attorney fees and any amount thereof is reviewed for an abuse of discretion. *Purcell*, 972 N.E.2d at 843. A trial court abuses its discretion if its decision clearly contravenes the logic and effect of the facts and circumstances or if the trial court has misinterpreted the law. *Id*.

[16] Addressing the individual contentions raised in Appellants' Complaint, the trial court concluded that (1) Appellants' claim that Appellees' had provided negligent advice was groundless and unreasonable; (2) Fahlsing's claim that Runkle's purported negligent advice had damaged his relationship with his daughters was groundless and unreasonable; (3) Appellants' contention that under the alter ego theory, Financial Group was liable for the actions of Financial was frivolous, unreasonable, and groundless; and (4) the statute of

limitations barred Appellees' claims and the pursuit thereof amounted to frivolous conduct by Appellants. We will review each finding in turn.

### 1. *Negligent Advice*

[17] Appellants first allege that Appellees provided negligent advice by failing to inform Fahlsing about the obligations and responsibilities of a general partner in a limited partnership. In support of these contentions, Appellants rely on the testimony of Fahlsing, who categorically stated that Runkle told him that he was "like a god on this because this is his creation, and he could do anything he wanted to with it." (Tr. p. 125). Fahlsing denied ever being informed not to use the assets of the partnership for his own personal use.

[18] On the other hand, both Runkle and Attorney Wray testified to having educated Fahlsing on the rights and obligations of a general partner in a limited partnership. Specifically, Runkle stated that he told Fahlsing that "a general partner controls the entity, makes the investments, is responsible for managing it for the limited partners[.]" (Tr. p. 19). Until the filing of the current lawsuit, Fahlsing never complained that Runkle had inadequately described the differences between a general and limited partner. Likewise, Attorney Wray testified that Runkle had explained correctly "how the limited partnership functions, how it works, what you can have in a limited partnership, what a limited partnership can do, how it can be treated for tax purposes" to Fahlsing because [Fahlsing] "knew all that in 2009 when he came to me for his divorce and brought all the record books." (Tr. p. 104).

[19] When faced with this contradictory evidence, the trial court unequivocally concluded that the "[c]ourt does not find Fahlsing to be a credible witness at all, as the inconsistencies and content of Fahlsing's testimony only served to establish his propensity for untruthfulness." (Appellants' App. Vol. II, p. 24). Specifically, the trial court noted:

> For example: At the bench trial, Fahlsing freely admitted that the June 29, 2011 Complaint he filed against his daughters knowingly contained untrue statements; . . . .Fahlsing's testimony contradicted his sworn discovery responses; and upon examination by opposing counsel, . . . regarding the admittedly untrue statements contained in the Complaint and Affidavit, Fahlsing astonishingly testified: **"My attorney can lie, cheat, and steal, and I can't?"**
>
> With regards to Fahlsing's testimony that Runkle allegedly rendered negligent advice to Fahlsing as to the general partnership duties, the [c]ourt finds such testimony to also be without credibility for the following reasons: Fahlsing executed twenty-one (21) promissory notes between himself, as the borrower, and Landmark, as the lender, evidencing his attempt to dissociate his personal affairs from the affairs of Landmark. If Runkle had indeed advised Fahlsing that the partnership assets could be used for Fahlsing's own personal use, logically, there would be no need for Fahlsing to draft and execute the promissory notes, nor attempt to separate his personal affairs from Landmark[.]

(Appellants' App. Vol. II, pp. 24-25) (emphasis in original).

[20] As we are not allowed to reweigh the credibility of the witnesses as established by the trial court and Appellants have presented us with no credible evidence

supporting their contention of negligence, we affirm the trial court's conclusion that Appellants' claim is groundless.

### 2. *Fahlsing's Relationship with Daughters*

Again, solely relying on Fahlsing's own testimony, Appellants assert that Runkle's advice severely damaged Fahlsing's relationship with his daughters. On the other hand, Jackson testified at trial that Fahlsing's claim was "absurd[;]" whereas Shannon informed the court that she had "never met [Runkle] until today." (Tr. pp. 54, 76). Again, the trial court concluded that "no credible facts exist to substantiate such a claim, and the only evidence offered was Fahlsing's own self-serving testimony, which, for the same reasons set forth above, the [c]ourt does not consider to be remotely credible." (Appellant's App. Vol. II, p. 25). Mindful of the trial court's credibility determination and the absence of any evidence supporting Appellants' claim, we affirm the trial court's conclusion that Appellants' contention is groundless.

### 3. *Alter Ego Doctrine*

Maintaining that there was no meaningful separation between the names, purpose, ownership, and business activities of Financial and Financial Group, Appellants assert that Financial Group was a mere continuation of Financial and, as such, can be held liable for the acts of Financial.

The corporate alter ego doctrine is a device by which a plaintiff tries to show that two corporations are so closely connected that the plaintiff should be able

to sue one for the actions of the other. *Konrad Motor and Welder Service, Inc. v. Magnetech Industrial Services, Inc.*, 973 N.E.2d 1158, 1165 (Ind. Ct. App. 2012). "The purpose of the doctrine is to avoid the inequity that results when one corporation uses another corporation as a shield from liability." *Id*. When a plaintiff seeks to pierce the corporate veil using this doctrine, we consider additional factors, including whether: (1) similar corporate names were used; (2) the corporations shared common principal corporate officers, directors, and employees; (3) the business purpose of the corporations were similar; and (4) the corporations were located in the same offices and used the same telephone numbers and business cards. *Id*. Corporate identity may be disregarded under the alter ego doctrine where multiple corporations are operated as a single entity; where they are "manipulated or controlled as a single enterprise through their interrelationship to cause illegality, fraud, or injustice or to enable one economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." *Id*. Factors indicating that a corporation is the alter ego of another may include the intermingling of business transactions, functions, property, employees, funds, records, and corporate names in dealing with the public. *Id*.

[24] The trial court concluded that Appellants' alter ego claim was frivolous, unreasonable, and groundless because

> a simple investigation by Fahlsing and Landmark, early on, would have undoubtedly revealed that: Runkle closed down [Financial] in 2006; Hannah subsequently formed and opened [Financial Group] in January 2007, an entirely separate entity;

[Financial] and [Financial Group] are not the same entity; [Financial] and [Financial Group] did not merge together; and Runkle had no ownership nor control over [Financial Group].

(Appellants' App. Vol. III, p. 26).

The undisputed evidence reflects that Runkle created Financial in 2001. He scaled down his involvement with Financial in 2003 by moving to Florida and "hoping to retire." (Tr. p. 13). He left the corporation in the hands of Miller and Hannah. In 2006, Miller and Hannah "kind of split apart" and Financial stopped doing business. (Tr. p. 13). At that point, Hannah formed Financial Group, which started doing business in 2007, at a different address from Financial and under a different FEIN number. However, Runkle allowed Financial to remain in good standing with the Secretary of State to receive trailing commissions from previously sold health care policies and used Financial Group's address to do so. Nonetheless, Runkle has no ownership interest or control in Financial Group. Although some employees remained the same between the two corporations and the corporate names are similar, there was no intermingling of business transactions and functions, nor were the corporations manipulated or controlled as a single entity. *See Konrad Motor and Welder Service, Inc.*, 973 N.E.2d at 1165. Both Runkle and Hannah viewed the corporations as separate entities, without any reincarnation of one company into the other. Although the claim might have been plausible at the initiation of the lawsuit, all these facts could have been discovered upon some simple research and were definitely known by Appellants at the moment they filed

their motion for summary judgment. The General Recovery Rule "places an obligation on litigants to investigate the legal and factual basis of the claim when filing and to continuously evaluate the merits of claims and defenses asserted throughout litigation." *General Collections, Inc. v. Decker*, 545 N.E.2d 18, 20 (Ind. Ct. App. 1989). Accordingly, we cannot say that the trial court erred by concluding that Appellants' claim based on the alter ego doctrine was groundless and frivolous.

### 4. *Statute of Limitations*

[26] In an attempt to circumvent the two-year statute of limitations, Appellants construct a novel theory that the continuous representation rule, which tolls the statute of limitations in cases of purported attorney malpractice, should be extended to the financial services realm. "The theory was that Runkle/[Financial] and Wray were engaged in a joint enterprise whereby Runkle/[Financial] provided legal services and advice with regard to things such as limited partnerships and trusts purported to be drafted by Wray when Wray financially benefitted from this arrangement." (Appellants' Br. p. 25).

[27] Under Indiana's discovery rule, a cause of action accrues, and the statute of limitations begins to run, when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury has been sustained as a result of the tortious act of another. *Doe v. United Methodist Church*, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996), *trans. denied*. For a cause of action to accrue, it is not

necessary that the full extent of the damage be known or even ascertainable but only that some ascertainable damage has occurred. *Id.*

[28] Appellants do not dispute that, pursuant to the discovery rule, Fahlsing was put on notice that he had sustained an injury by acting on Runkle's purported negligent advice that a general partner could use partnership assets for his personal use when he received the complaint filed against him by his daughters on June 7, 2011, and which alleged, as follows:

> Upon further information and belief, [Fahlsing] has been using Landmark assets to pay non-partnership liabilities and/or his personal obligations.

> [Fahlsing's] actions in using Landmark assets to pay non-partnership liabilities and/or individual obligations, as well as his failure to provide an accounting of the assets and affairs of Landmark, in accordance with the Partnership Agreement, and his threat of dissipation of Landmark assets all constitute a breach of the Partnership Agreement.

> [Fahlsing's] actions in using Landmark assets to pay non-partnership liabilities and/or his individual obligations, as well as his failure to provide an accounting of the assets and affairs of Landmark, constitute a breach of the Partnership Agreement.

(Tr. Exh. Vol. I, Exh. 4). As such, Appellants had until June 7, 2013, to file their Complaint, which they failed to file until November 21, 2014, more than three years after Fahlsing could have discovered his injury.

[29] However, Appellants now contend that the statute of limitations was tolled by the continuous representation theory. Under the continuous representation doctrine, the statute of limitations does not commence until the end of an attorney's representation of a client in the same matter in which the alleged malpractice occurred. *Biomet, Inc. v. Barnes & Thornburg*, 791 N.E.2d 760, 765 (Ind. Ct. App. 2003), *trans. denied*. In *Bambi's Roofing Inc. v. Moriarty*, 859 N.E.2d 347, 357 (Ind. Ct. App. 2006), we applied the continuous representation rule to the accounting profession, limiting the rule to the accountant's representation in the same, specific matter. The purpose of the rule is to give accountants an opportunity to remedy their errors, establish that there was no error, or attempt to mitigate the damage caused by their errors, while still allowing the aggrieved client the right to later bring a malpractice action, and not to circumvent the statute altogether by continuously representing the client. *Id*. at 358. Applying the rule to the current situation, Appellants contend— without citing any supporting precedents—that due to the joint enterprise between Runkle and Attorney Wray for which one can be held liable for the negligent actions of another, the continuous representation applicable to Attorney Wray should be applied to Runkle as well.

[30] However, Appellants' novel theory fails right out of the gate. There was never any joint enterprise between Runkle and Attorney Wray that led to the culmination of mutually dependent services, whereby both "should be held jointly liable to the extent [Fahlsing] is damaged by deficient advice;" rather, at

most there was a loose collaboration between the two persons.[1] (Appellants'
Br. p. 25). At trial, Runkle testified that Attorney Wray was never an employee
of Financial, nor did he ever possess any ownership interest in Financial.
Instead, depending on the needs of Financial's clients, Runkle would bring in
specialists, one of which could be Attorney Wray, and "collaborate with the
appropriate people." (Tr. p. 17). "Every client that comes in is given a choice
whether they would like to seek personal counsel or use somebody that we're
comfortable working with." (Tr. p. 40). Attorney Wray was not the only
attorney referred to by Runkle to develop or produce limited partnership and
trust agreements. If a client was unhappy with the representation, Runkle could
offer names of other trustworthy professionals. "This was routinely offered."
(Tr. p. 42). In his testimony, Attorney Wray confirmed that he was not
employed by either company, nor did he possess an ownership interest. He
explained that he had a separate office but also could use an office at Financial
if the clients requested personal meetings with him at the company.

[31] Furthermore, *assuming arguendo* that if a joint enterprise existed, the continuous
representation theory is not applicable to the relationship between Runkle and
Attorney Wray. Analyzing Appellants' claims, they assert that
"Runkle/[Financial] provided legal service and advice with regard to things

---

[1] Because we determine that there is no joint enterprise between Runkle and Attorney Wray, we will not
address Appellants' argument that when members of an unincorporated association are engaged in a joint
enterprise, the negligence of each member in support of that enterprise is imputable to each and every other
member.

such as limited partnerships and trusts purported to be drafted by [Attorney Wray] when [Attorney Wray] had no meaningful involvement and that both Runkle/[Financial] and [Attorney Wray] financially benefitted from this arrangement." (Appellants' Br. p. 25). As such, Appellants reason that the wrong occurred during the general course of an ongoing professional relationship, not in a continued representation with respect to a particular undertaking or specific transaction in which they had committed a professional error. *See Bambi's Roofing, Inc.*, 859 N.E.2d at 357 ("Essentially, the case law has established that the continuous representation must be in connection with the specific matter directly in dispute, and not merely the continuation of a general professional relationship.")

[32] Most importantly, Runkle is neither an attorney nor a certified public accountant. Appellants cannot point to any precedents that would suggest the continuous representation doctrine applies to the provision of financial services, nor can they proffer a rational argument for extending the continuous representation theory to include financial advisors. Although "commencement of an action may often be justified on relatively insubstantial grounds," even the most cursory review of the law would have revealed ample reason not to pursue this claim. *Kahn v. Cundiff*, 543 N.E.2d 627, 629 (Ind. 1989). While in some situations a running of the statute of limitations will be dependent upon information derived from the discovery process or even at trial, here we find

that Appellants' assumptions with respect to the validity of this claim were completely groundless and pursuing the claim nevertheless was frivolous.[2]

## II. *Appellate Attorney Fees*

[33] In their appellate brief, Appellees request an award of appellate attorney fees pursuant to Appellate Rule 66(E), which provides, in pertinent part, "[t]he [c]ourt may assess damages if an appeal . . . is frivolous or in bad faith. Damages shall be in the [c]ourt's discretion and may include attorney's fees." Our discretion to award attorney fees under Indiana Appellate Rule 66(E) is limited, however, to instances when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). Additionally, while Indiana Appellate Rule 66(E) provides this court with discretionary authority to award damages on appeal, we must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal. *Id*.

[34] Indiana appellate courts have formally categorized claims for appellate attorney fees into substantive and procedural bad faith claims. *Boczar v. Meridian Street Found*., 749 N.E.2d 87, 95 (Ind. Ct. App. 2001). To prevail on a substantive

---

[2] Appellants contend for the first time in their appellate brief that Indiana Code section 34-52-1-1(b) does "not support a standalone counterclaim." (Appellant's Br. p. 30). As "parties cannot raise an argument for the first time on appeal," we find that Appellants waived our review of the issue. *Welty Bldg. Co., Ltd. v. Indy Fedreau Co., LLC*, 985 N.E.2d 792, 799 (Ind. Ct. App. 2013).

bad faith claim, the party must show that the appellant's contentions and arguments are utterly devoid of all plausibility. *Id.* Procedural bad faith, on the other hand, occurs when a party flagrantly disregards the form and content requirements of the rules of appellate procedure, omits and misstates relevant fact appearing in the record, and files briefs written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court. *Id.* Even if the appellant's conduct falls short of that which is "deliberate by design," procedural bad faith can still be found. *Id.*

[35] Appellees first argue that Appellants' complete disregard for Fahlsing's credibility issue amounted to procedural bad faith which entitled them to an award of appellate attorney fees. We disagree. While Appellants failed to explicitly mention Fahlsing's lack of credibility in their statement of facts, they did advise this court that certain evidence was disputed. Furthermore, Appellants did point out in their argument section that Fahlsing's credibility had been called into doubt and therefore they would refer to other evidence to support their claims. Albeit that the admission of Fahlsing's credibility issue is downplayed to an almost cursory reference, this flaw does not rise to the level of egregiousness punishable under Appellate Rule 66(E).

[36] Turning to the substantive bad faith, Appellees advance that "Fahlsing's arguments on appeal are utterly devoid of all merit [and] warrant[] an award of fees." (Appellees' Br. p. 39). Relying on the same substantive arguments that the trial court denied on summary judgment and pursuant to which the trial court awarded attorney fees, Appellants nevertheless ignored these unfavorable

determinations and rulings by the trial court and instituted these appellate proceedings. As noted by the trial court, a simple investigation could have revealed that Appellants' arguments were utterly devoid of all plausibility and Appellants' position was not consistent with reasonable advocacy grounded in established legal principles. Therefore, we conclude that this appeal was merely another attempt to harass the parties involved. Accordingly, we remand this cause to the trial court for a determination of reasonable appellate attorney fees to be awarded to Appellees.

## CONCLUSION

[37] Based on the foregoing, we hold that the trial court did not commit error by awarding attorney fees to Appellees pursuant to Indiana Code section 34-52-1-1(b). Furthermore, we grant Appellees' request to award appellate attorney fees pursuant to Indiana Appellate Rule 66(E) and remand to the trial court for determination of reasonable appellate attorney fees.

[38] Affirmed and remanded.

[39] Najam, J. and Bradford, J. concur