## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 26 2018, 8:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Russell T. Clarke, Jr.
Emswiller, Williams,
Noland & Clarke, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Robert M. Hamlett
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re the Patricia J. McCallister Living Trust: | January 26, 2018 |
| Lee McCallister, | Court of Appeals Case No. 18A04-1704-TR-766 |
| *Appellant-Petitioner,* | Appeal from the Delaware Circuit Court |
| v. | The Honorable Marianne L. Vorhees, Judge |
| Ross W. McCallister, | Trial Court Cause No. 18C01-1601-TR-1 |
| *Appellee-Respondent* | |

**Baker, Judge.**

[1] In November 2015, elderly Patricia McCallister's five adult children decided that she could no longer safely live by herself. Some of the siblings agreed that Ross McCallister, the only one of the five who lived in Indiana, would move into Patricia's home to provide the care that she needed. In December 2015, Patricia amended her living trust (the Trust) to make Ross the sole successor trustee and provide him with a one-half ownership interest in her home. Thereafter, the family split down the middle; rancor and distrust reigned even as Patricia's health was failing.

[2] In January 2016, Lee McCallister filed a petition seeking reinstatement as a co-trustee. After Patricia's death in April 2016, Lee filed another petition seeking Ross's removal as trustee. Following a four-day trial, the trial court found that there was no evidence supporting Lee's claims and granted an involuntary dismissal of his petitions. It also found that his claims were unreasonable and awarded attorney fees to Ross in the amount of $144,909.05. Lee now appeals, arguing that the trial court should not have involuntarily dismissed his claims and erred by awarding attorney fees to Ross. Ross also requests an award of appellate attorney fees. Finding no error and denying Ross's request for appellate attorney fees, we affirm.

## Facts

[3] Patricia had five children: Lee, Becky, Kathy, Cindy, and Ross. All the adult children except for Ross live out of state. On July 16, 2014, Patricia executed

the Trust. Lee and Ross were present when she signed that document and were named as co-successor-trustees.

[4] Around Thanksgiving 2015, Patricia's children had conversations about providing for Patricia's need for physical assistance. Patricia wished to remain in her home and none of the children living out of state could move to Indiana or offer to have Patricia live with them. Therefore, at Patricia's request, Ross and his family moved from their home in Indianapolis into Patricia's home in Muncie and assumed responsibility for her care despite vehement objections from Becky and Lee.

[5] On December 16, 2015, Patricia amended the trust, removing Lee as a co-trustee and providing that, upon her death, a one-half interest in her home would pass to Ross and he would be permitted to purchase the remaining one-half interest based on its fair market value. She also executed a new power of attorney, designating Ross as her sole attorney in fact and removing Lee as an attorney in fact. On January 15, 2016, Lee filed a petition seeking reinstatement as a co-trustee.[1]

[6] Patricia died on April 26, 2016. Following her death, Ross appeared in this case as successor trustee, Lee's attorney withdrew, and Lee (a licensed attorney in New York) continued litigating the case pro se. On May 24, 2016, Lee filed a petition that Ross be removed as co-trustee and that a constructive trust be

---

[1] He also filed a guardianship petition, but that was dismissed following Patricia's death.

created for all of Patricia's property; he later filed a request for a temporary restraining order enjoining Ross from spending Trust funds, distributing Trust assets, or disposing of any proceeds of Patricia's estate. At the heart of Lee's petitions were claims that Ross exerted undue influence over Patricia and that Patricia was incapacitated at the time she executed the Trust amendment.[2]

[7] An evidentiary hearing on Lee's petitions took place on July 6, September 27, and December 21 and 22, 2016. Lee presented the testimony of six witnesses: Becky; Kathy; Reverend Katherine Rieder; Myrna McCallister, Lee's aunt and Patricia's sister-in-law; Dr. Larry McCallister, Lee's father and Patricia's ex-husband; and Dr. Jane Heaton, Patricia's niece. Lee did not testify, nor did he present testimony of Patricia's long-time treating physician or any other medical professional who had actually provided her with medical care.

[8] After Lee finished presenting his evidence, Ross moved for judgment on the evidence, arguing that there was no evidence that Patricia was incapacitated when she amended the Trust or that the amendment was the result of undue influence. The trial court agreed, ruling in favor of Ross.[3] On March 22, 2017, the trial court entered an order that provides, in pertinent part, as follows:

---

[2] Lee also included a claim of inadequate accounting by Ross and a claim that the amendment was executed improperly, but does not pursue the denial of those claims on appeal.

[3] The trial court issued a preliminary order granting the motion for judgment on the evidence on December 22, 2016, but explicitly noted that the order was not final and appealable. Appellant's App. Vol. II p. 36. Ross contends that it was, in fact, a final order and that Lee was required to appeal it within thirty days. Given that the order stated that it was not final and appealable and that the trial court explicitly stated the same to the parties, we think it reasonable that Lee waited for a final order before filing his notice of appeal.

2. The limited medical evidence that Petitioner presented demonstrated Patricia was competent to make her own decisions through at least February, 2016, well after the December, 2015, date when she amended her Trust.

3. In order to prove Patricia's incapacity or incompetency, Petitioner needed to bring forward medical evidence. Dr. McCallister's [Lee's father's] evidence was not sufficient. He cannot give an opinion based upon a five minute telephone conversation with Patricia. Dr. Heaton [Patricia's niece] testified in order to diagnose Patricia adequately, a physician would have to meet with her face-to-face. Dr. Heaton's e-mail in February, 2016, stated Patricia had the capacity to make her own decisions.

***

5. As to undue influence, Petitioner did not present evidence to go forward with the claim. There [was] little to no evidence related to December, 2015, the relevant time period. There was evidence that Patricia's condition started to deteriorate after the first of the year [2016], when Patricia suffered several strokes.

6. Petitioner did not present sufficient evidence to go forward with the undue influence claim. Petitioner did not present evidence that in December, 2015, when she executed the Amendment, her will and desires were overcome by another individual.

Appealed Order p. 1. Ross filed a request for attorney fees in the amount of $144,909.05, arguing that the lawsuit was frivolous and made in bad faith. The trial court agreed:

Lee has filed throughout this litigation and continues to file pleadings containing multiple pages, including numerous exhibits, which are not easy to read and understand. He has not demonstrated he understands the Indiana Trial Rules. Lee's filings and his presentation during the trial have made it very difficult for the Court to discern exactly what his claims are, and I am sure the reason the Trust's fees are so high is due in part to the same factors.

*\*\**

Deciding whether to award attorney's fees does not require the Court to find the litigant is a bad person or was not sincere in his beliefs that something was wrong. Lee had a strong belief that his claim was valid. The question is whether a reasonable attorney would have considered the claim "worthy of litigation or justified."

*\*\**

Claims regarding competency: Lee did not present any current, credible medical testimony regarding his mother's competency to execute the amendments to the Trust on December 16, 2015. A "Google" search would have provided numerous case citations to the standard in Indiana to show a testator was not competent. No reasonable attorney would have considered it worthy to press forward on this claim with the evidence at hand.

The best witness to have testified to Patricia's competency would have been the physician she saw on a regular basis, Dr. Lloyd. For some reason not explained to the Court, Lee did not choose to call Dr. Lloyd. Notes from Dr. Lloyd's office approximately contemporaneous with the time Patricia executed the amendment indicated she was competent at that time. Lee's claims regarding competency would have been stronger had he

called Dr. Lloyd and had him testify to his observations and his office records.

Claims regarding undue influence: this was an issue as to which Lee submitted absolutely no evidence that the undersigned noted or can recall. A reasonable attorney would have abandoned this claim, or would have presented some evidence to support it.

*Id.* at 2-3. The trial court ordered that Lee pay the Trust's attorney fees in the amount of $144,909.05. Lee now appeals.

# Discussion and Decision

# I. Involuntary Dismissal

[9] Lee first argues that the trial court improperly granted Ross's motion for judgment on the evidence on Lee's claims of incapacity and undue influence. While Ross moved for judgment on the evidence and the trial court used the same terminology in granting the motion, our Supreme Court has squarely held that judgments on the evidence are not applicable to bench trials. *Vega v. City of Hammond*, 80 N.E.3d 904, 909 (Ind. 2017). In the context of bench trials, a motion for judgment on the evidence should be treated as an Indiana Trial Rule 41(B) motion for involuntary dismissal. *Id.* A Trial Rule 41 motion to dismiss tests the sufficiency of the plaintiff's case-in-chief, and our review is limited to an examination of the evidence most favorable to the non-movant that was presented before the motion to dismiss was filed. *Id.*

Additionally, Lee is appealing a negative judgment because he bore the burden of proof. As such, he "must show that the evidence points unerringly to a conclusion different from that reached by the trier of fact, or that the judgment is contrary to law." *Alexander v. Alexander*, 980 N.E.2d 878, 880 (Ind. Ct. App. 2012).

# A. Incapacity

Lee argues that the trial court erroneously ruled that he failed to present sufficient evidence that Patricia was incapacitated at the time she executed the amendment to the Trust. This Court has explained the showing that must be made to support a claim of incapacity:

> "The capacity of a settlor that is required to . . . amend . . . a revocable trust is the same as the capacity of a testator that is required to make a will." Ind. Code § 30-4-2-10(b). Every person is presumed to be of sound mind to execute a will. To rebut this presumption, a party must show that the testator, at the time of executing his will, lacks the mental capacity to know: "(1) the extent and value of [her] property; (2) those who are the natural objects of [her] bounty; and (3) their deserts, with respect to their treatment of and conduct towards [her]." [*Gast v. Hall*, 858 N.E.2d 154, 165 (Ind. Ct. App. 2006).] It is the testator's mental capacity or soundness of mind at the time she executes the document at issue that is controlling. *Id.*

*In re Rhoades*, 993 N.E.2d 291, 299 (Ind. Ct. App. 2013) (some internal citations omitted; internal alterations original).

[12]    The evidence in the record related to Patricia's competency at the time she executed the Trust amendment can be summarized as follows:

- In December 2015, Patricia underwent a mental health examination, but no doctor was present and no formal medical diagnosis was made. Tr. Vol. II p. 139-40. A nurse practitioner later concluded based on the examination that while Patricia had cognitive decline, she was "able to make decisions and ask for help[.]" Tr. Ex. Vol. V p. 2.

- Myrna (Patricia's sister-in-law) testified that in December 2015, Patricia was unable to read or drive but could make some decisions. Tr. Vol. II p. 239. Myrna did not see Patricia between September or October 2015 and March 2016. *Id.* at 247.

- Becky testified that Patricia had had a series of strokes that affected her mental capacity but did not offer a time frame except that Patricia had a stroke in early January 2016—after the amendment was executed. *Id.* at 20. She testified that Patricia's capacity had gradually diminished over the prior two years and that, at times, she was unable to read, but Becky was unable to testify as to Patricia's capacity at the time of the execution of the Trust amendment. *Id.* at 61-62.

- In January 2016, Patricia visited her long-time physician, Dr. Lloyd, for a routine follow-up visit. He found her affect and mood to be appropriate and found her to be alert and oriented. Tr. Ex. Vol. V p. 75.

- In February 2016, Dr. Heaton (Patricia's niece), who is a geriatric physician, sent an email to Lee indicating that Patricia was "quite mentally clear" and was "content and satisfied with[]her situation." Tr. *Id.* at 28. She also noted that Patricia's "physical situation" had deteriorated far more "than her mental capacity to understand the consequences of her decisions." *Id.* at 84.

- Dr. Heaton also testified that she had not seen Patricia face-to-face since 2008 and that "you cannot evaluate someone unless you see them face to

face . . . and I . . . have had . . . just superficial, familial conversations with her. . . . I certainly have not performed a mental status exam on [Patricia]." Tr. Vol. III p. 190.

- In February 2016, Patricia visited Dr. Lloyd again because of stress relating to the tension in the family. Dr. Lloyd found as follows: "affect and mood appropriate. Alert and oriented, a little slow with response. Expressive aphasia."[4] Tr. Ex. Vol. V p. 70. Dr. Lloyd further stated that he "[h]ad a long discussion with patient alone about the direction of care she wishes to pursue, with out [sic] any cues, she wishes for son Ross and his family from Indianapolis to be her support physically and mentally . . . I do believe that her wishes are with Ross." *Id.* at 70-71.

- Kathy testified that she had "an impression" that at the time Patricia executed the amendment, she was not competent to do so. Tr. Vol. II p. 133. Kathy admitted, however, that she "didn't really know enough" to determine whether Patricia was competent at that time. *Id.* at 105.

- Larry, Patricia's ex-husband and a physician, testified that at some point after Ross moved into Patricia's house, Larry had a three- to five-minute phone call with Patricia. Based solely on that phone call, he concluded that Patricia had dementia. Tr. Vol. III p. 139-41, 148-49.

As noted in the trial court's order, Lee did not call Dr. Lloyd to testify.

[13]   While the record tends to suggest that Patricia had some degree of physical and verbal impairment resulting from age and a series of strokes over the years, there is no competent evidence establishing that she was incapacitated. Her primary care physician found her to be alert and oriented in the months after

---

[4] In Dr. Heaton's words, for Patricia, expressive aphasia meant that "[s]he knew what she wanted to say, but she couldn't come up with the words." Tr. Vol. III p. 185.

she executed the Trust amendment. Myrna and Dr. Heaton had not seen Patricia for months leading up to the execution of the Trust amendment, and Dr. Heaton found Patricia to be quite mentally clear and to have sufficient mental capacity in multiple phone conversations. Becky and Kathy were unable to testify regarding Patricia's capacity at the time she executed the Trust amendment. And, while Larry concluded that Patricia was suffering from dementia and/or Alzheimer's, he did so based on one three-to-five-minute phone call.

[14] This evidence simply does not establish that, at the time Patricia executed the Trust amendment, she lacked the mental capacity to know (1) the extent and value of her property; (2) those who are the natural objects of her bounty; and (3) their deserts, with respect to their treatment of and conduct towards her. Therefore, the trial court did not err by granting Ross's motion for involuntary dismissal of this claim.

# B. Undue Influence

[15] Next, Lee argues that the trial court should not have involuntarily dismissed his claim based on undue influence. Undue influence is defined as "the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." *In re Estate of Wade*, 768 N.E.2d 957, 962 (Ind. Ct. App. 2002). A confidential relationship sufficient to support an undue influence claim may arise as a matter of law; included in this

category is the relationship between a parent and child. *Rhoades*, 993 N.E.2d at 301. These relationships raise "a presumption of trust and confidence as to the subordinate party on the one side and a corresponding influence as to the dominant party on the other." *Supervised Estate of Allender v. Allender*, 833 N.E.2d 529, 533-34 (Ind. Ct. App. 2005) (noting that while generally the parent is the dominant party in the parent-child relationship, when an adult child is the caretaker for an elderly parent, the roles reverse).

[16] The law will impose a presumption that a transaction was the result of undue influence where the plaintiff's evidence shows that (1) there was such a relationship and (2) the dominant party benefits from a questioned transaction. *Rhoades*, 993 N.E.2d at 301. The burden then shifts to the dominant party to rebut the presumption by providing clear and convincing evidence that the dominant party acted in good faith and did not take advantage of the position of trust, and that the transaction was fair and equitable. *Id.*

[17] We agree that Lee's evidence established a confidential relationship between Ross, as the dominant party, and Patricia, as the subordinate party. We also agree that Ross benefited from the Trust amendment, as Patricia gave him a one-half interest in her home and the opportunity to buy the other half at fair market value. Therefore, Lee is correct that the burden should have shifted to Ross.

[18] Even though the burden shifted, however, we find sufficient evidence in the record to support the trial court's determination that the evidence did not

establish undue influence.  Most of Lee's evidence was conclusory and not based on personal knowledge, and the vast majority of it related to whether Patricia actually wanted Ross and his family to move in with her rather than whether undue influence related to the execution of the Trust amendment.

[19]   But even if we gave that evidence the benefit of the doubt, nearly *all* of it covers January through April 2016—*after* the amendment was executed—or has no time frame attached whatsoever.

- Becky testified in a conclusory way that Ross isolated Patricia from friends and family, but eventually acknowledged that the cut-off did not occur until February 2016.  Tr. Vol. II p. 78.  The remainder of her testimony has no time frame attached.  Becky did not even see Patricia between Thanksgiving 2015 and January 2016.  Tr. Vol. III p. 41.

- Kathy testified that in late January, Ross took Patricia's phone and told her friend she was no longer permitted to visit.  Tr. Vol. II p. 149-50.

- Kathy testified that she and Ross coached Patricia about certain things to say, but did not provide a time frame for these actions.  Tr. Vol. III p. 117-19.

- Rev. Rieder testified that near the beginning of 2016, she visited Patricia and Ross was reluctant to leave the room.  The remainder of her testimony relates to visits made in the months leading up to Patricia's death.  *Id.* at 170-75, 184-85.

- Myrna did not see Patricia in November or December 2015 and only has second-hand knowledge about the situation.  *Id.* at 239.  She admitted that most of what she knows about Ross is not based on personal knowledge.  *Id.* at 5.

Indeed, the *only* contemporaneous evidence regarding the situation in December 2015 was Kathy's December 10, 2015, email in which she stated the following:

> . . . I don't know why there is still a discussion [about whether Ross should move in with Patricia] because Mom clearly said that she wants Ross and his family to move up there. Her exact words were 'I think I could adjust to having Ross and his family here' and 'the status quo [in which she lived by herself] is not OK". We all heard her say that. And she said the same thing several other times during the last two weeks[.]

Tr. Ex. Vol. V p. 46. Kathy admitted that, while she was not always honest with her siblings about the situation, she would not have been dishonest about the content of the email because everyone witnessed Patricia making those statements. Tr. Vol. III p. 126.

[20] We agree with the way in which the trial court evaluated the evidence in the record regarding undue influence:

> . . . [T]he evidence indicated that everything seemed to go well through Thanksgiving, 2015, that Mrs. McCallister was having some physical issues that she could not live on her own at that time. It seems pretty much unanimous by everybody that she wanted to stay in her own home, she did not want to go to a nursing home . . . , all the other children were far away from her, so the best option to keep her in the home was that Ross would live with her. . . .

> ***

> The undue influence claim . . . . Yes, Mrs. McCallister was living in the home, she was in her own home. She had friends come over, she had the, the church friends that talked the first time, she had, it looks like other neighbors came in and checked on her. Again, focusing in on December of 2015, there was no evidence that she was isolated or that her will was overcome [or that] she didn't want to make that trust amendment but somehow her will was overcome so that she did make the trust amendment.

*Id.* at 238-40. Given the dearth of evidence regarding the brief time between the date on which Ross moved in with Patricia—which was after Thanksgiving 2015—and the date of the execution of the Trust amendment, which occurred mere weeks later on December 16, 2015, we find that the evidence supports the trial court's conclusion that Ross acted in good faith and did not take advantage of the position of trust, and that the transaction was fair and equitable. Consequently, we affirm the trial court's involuntary dismissal of the undue influence claim.

## II. Attorney Fees

[21] Finally, Lee argues that the trial court erroneously granted Ross's request for attorney fees. The trial court awarded fees pursuant to Indiana Code section 34-52-1-1, which provides that a trial court may award attorney fees to the prevailing party if the court finds that the non-prevailing party:

    (1)    Brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;

> (2)     Continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or
>
> (3)     Litigated the action in bad faith.

This Court has defined "unreasonable" as follows:

> A claim is "unreasonable" if, based upon the totality of the circumstances, including the law and facts known at the time, no reasonable attorney would consider the claim justified or worthy of litigation.

*Landmark Legacy, LP v. Runkle*, 81 N.E.3d 1107, 1113-14 (Ind. Ct. App. 2017) (internal citations omitted). An award of attorney fees is within the trial court's discretion, and we will reverse only if its decision clearly contravenes the logic and effect of the facts and circumstances or if the trial court has misinterpreted the law. *Id.*

[22]    The trial court found that each of Lee's claims were unreasonable. Specifically:

> Claims regarding money Ross had spent: Even though Lee submitted numerous documents and argued Ross had spent money in an inappropriate manner, the only claim at trial concerned one dinner that Ross charged to his mother's credit card. A reasonable attorney would have realized that (1) Lee had no claim for inappropriate expenditures or (2) Lee should have saved this argument until after Ross filed his accounting and the accounting was open to objections. All the testimony and exhibits related to money spent by Ross caused the proceedings extra time and extra work by the attorney for the Trustee and was unreasonable.

Claims regarding competency: Lee did not present any current, credible medical testimony regarding his mother's competency to execute the amendments to the Trust on December 16, 2015. A "Google" search would have provided numerous case citations to the standard in Indiana to show a testator was not competent. No reasonable attorney would have considered it worthy to press forward on this claim with the evidence at hand.

The best witness to have testified to Patricia's competency would have been the physician she saw on a regular basis, Dr. Lloyd. For some reason not explained to the Court, Lee did not choose to call Dr. Lloyd. Notes from Dr. Lloyd's office approximately contemporaneous with the time Patricia executed the amendment indicated she was competent at that time. . . .

Claims regarding undue influence: this was an issue as to which Lee submitted absolutely no evidence that the undersigned noted or can recall. A reasonable attorney would have abandoned this claim, or would have presented some evidence to support it.

Claims regarding execution of the amendment: Lee submitted no evidence at the trial concerning how the amendment was executed. Again, the best witness to have testified to the execution would have been the attorney who prepared the document and who could have testified to how he worked with Patricia in its preparation and how Patricia executed it. . . . A reasonable attorney would have known a claim without some evidence as to the document's execution was frivolous and not worthy of litigating.

Appealed Order p. 3-4. We see no reason to second-guess the trial court's conclusions regarding the manner in which Ross spent Trust funds or the claim that the amendment was somehow improperly executed—Lee simply did not present evidence suggesting that these claims were reasonable to maintain.

[23] Lee argues that the trial court erred by concluding that he had presented no evidence regarding undue influence. As noted above, however, we agree with the trial court, inasmuch as almost none of Lee's evidence regarding undue influence related to the relevant period of time—the days leading up to and including the day on which the Trust amendment was executed. Given that, we do not find that the trial court erred by concluding that this claim was unreasonable.

[24] Lee argues that the trial court erred by concluding that he presented no credible medical evidence regarding Patricia's alleged incapacity. He presented absolutely no evidence from a medical provider who had evaluated Patricia's mental acuity. Testimony from Dr. McCallister or Dr. Heaton does not suffice—neither of those individuals performed a medical evaluation in the context of a doctor-patient relationship. He did not call Dr. Lloyd as a witness, and records from Dr. Lloyd indicate that, in fact, he found Patricia to be alert, oriented, and clear in January and February 2016. Under these circumstances, the trial court did not err by finding that this claim was unreasonable.

[25] Given that the trial court did not err by finding that Lee's claims were unreasonable—or that, at the least, he continued to litigate after those claims became unreasonable—we find no error in the trial court's award of attorney fees to Ross. We likewise find no error in the amount of fees ordered by the trial court. We deny Ross's request for appellate attorney fees.

The judgment of the trial court is affirmed.

Riley, J., and Brown, J., concur.